ATTORNEY GENERAL v MICHIGAN PUBLIC SERVICE
COMMISSION

Docket No. 58659. Submitted October 12, 1982, at Lansing.—Decided
February 8, 1983. Leave to appeal applied for.

In 1974, Consumers Power Company petitioned the Public Service
Commission for authority to include a purchased power adjust-
ment clause in the schedule of rates for electric power. The
purpose of that provision was to provide for rate adjustments to
reflect any changed costs for purchased power. In 1976, the
Public Service Commission approved the purchased power ad-
justment clause and incorporated it into the rate schedule for
Consumers Power Company's electric service. The clause per-
mitted Consumers to recover 90% of any increased cost in-
curred in the purchase of power from outside sources and was
designed to work in tandem with the fuel adjustment clause.
The clause set up an elaborate schedule for monthly notices
and hearings for commission approval of monthly purchased
power adjustments, with semi-annual review and refunds to
customers if the monthly purchased power adjustments and
fuel adjustments exceeded the 90% of increased costs bench-
mark. The Attorney General sought review in Ingham Circuit
Court of the order approving the purchased power adjustment
clause and about three dozen commission orders approving rate
adjustments pursuant to the purchased power adjustment
clause, raising a number of issues as to the statutory validity of
the purchased power adjustment clause. Thomas L. Brown, J.,
affirmed the determination of the commission. The Attorney
General appeals. *Held:*

1. The Public Service Commission has the statutory authority
to provide for monthly adjustments to electric rates based upon

REFERENCES FOR POINTS IN HEADNOTES
[1] 64 Am Jur 2d, Public Utilities § 240.
[2-4] 64 Am Jur 2d, Public Utilities § 177.5.
   Validity of "fuel adjustment" or similar clauses authorizing electric
   utility to pass on increased cost of fuel to its customers. 83
   ALR3d 933.
[5] 5 Am Jur 2d, Appeal and Error § 700.
[6, 7] 64 Am Jur 2d, Public Utilities §§ 284, 285.

purchased power costs to be made after the necessary notice and hearing.

2. Since only the cost of purchased power is involved in purchased power adjustments, it is unnecessary to re-examine the other statutorily mandated factors necessary to fix the base rate in considering a purchased power rate adjustment.

3. A new petition or complaint is unnecessary for each monthly purchased power adjustment, since the adjustment is part of the utility's rate schedule rather than being in the nature of a change in the rate structure.

4. The monthly purchased power adjustment is not in the nature of "partial and immediate relief" so as to require the statutorily mandated staff investigation and report, since the adjustment clause is in the nature of final relief by the commission which amends the utility's rate schedule.

5. The Public Service Commission's order granting the purchased power adjustment clause adequately took into account anticipated future sales increases over the base year so as to avoid a windfall to the utility.

6. The Attorney General, both before the commission and on appeal, failed to support either factually or legally his contentions that the cost of the purchased power used to fill the Ludington pumped storage facility exceeded the cost of purchased power had such power been purchased during peak periods when pump stored power was used. Accordingly, that issue is deemed to be abandoned.

Affirmed.

1. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — ELECTRIC UTILITY COMPANIES — PURCHASED POWER ADJUSTMENTS.

It is within the statutory authority of the Public Service Commission to provide, after notice and hearing, monthly purchased power adjustments in the rates charged by regulated electric utility companies (MCL 460.6, 460.6a; MSA 22.13[6], 22.13[6a]).

2. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — ELECTRIC UTILITY COMPANIES — PURCHASED POWER ADJUSTMENTS — STATUTORY RATE FACTORS.

The Public Service Commission, in considering an adjustment in rates charged by an electric utility company based only upon a change in the cost of purchased power, is not required to consider all of the statutorily mandated factors which must be considered when an across-the-board rate increase is being considered (MCL 460.557; MSA 22.157).

3. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — ELECTRIC UTIL-
   ITY COMPANIES — PURCHASED POWER ADJUSTMENTS.

   A separate petition or complaint for each monthly purchased
   power adjustment is not required; the lack of such petition or
   complaint is not violative of the mandated statutory scheme,
   since the purchased power adjustment clause is a permanent
   part of the electric utility company's rates and schedules
   granted by the Public Service Commission pursuant to a prop-
   erly filed petition by the utility company (MCL 460.552,
   460.557; MSA 22.152, 22.157).

4. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — ELECTRIC UTIL-
   ITY COMPANIES — PURCHASED POWER ADJUSTMENTS — STAFF
   INVESTIGATIONS.

   An order of the Public Service Commission authorizing a pur-
   chased power adjustment in the rates charged by an electric
   utility company is not void by reason of the absence of a staff
   investigation and report, since such investigation and report is
   required by statute only where partial and immediate relief is
   being considered and the purchased power adjustment clause
   under which the rate is charged is in the nature of final relief
   amending the utility's rate schedule (MCL 460.6a; MSA
   22.13[6a]).

5. APPEAL — PRESERVING QUESTION.

   The mere statement of an argument, absent citation of support in
   the record or statutory or case law authority, is insufficient to
   establish an issue for appellate review; under such circum-
   stances the issue is deemed to have been abandoned.

6. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — RATES —
   PRESUMPTIONS.

   All rates, fares, charges, classification and joint rates, regulations,
   practices, and services prescribed by the Public Service Com-
   mission are deemed, prima facie, to be lawful and reasonable
   (MCL 462.25; MSA 22.44).

7. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — ORDERS —
   BURDEN OF PROOF.

   Any person attacking an order of the Public Service Commission
   has the burden of proving by clear and satisfactory evidence
   that the order is unlawful or unreasonable (MCL 462.26; MSA
   22.45).

*Frank J. Kelley,* Attorney General, *Louis J.*

*Caruso,* Solicitor General, and *Hugh B. Anderson,* Assistant Attorney General, for plaintiff.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Arthur E. D'Hondt* and *Don L. Keskey,* Assistants Attorney General, for the Michigan Public Service Commission.

*Lawrence B. Lindemer, Allen B. Bass* and *David A. Mikelonis* and *Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *George W. Loomis, Harvey J. Messing* and *Michael G. Oliva),* for Consumers Power Company.

Before: D. E. HOLBROOK, JR., P.J., and J. H. GILLIS and M. E. DODGE,* JJ.

J. H. GILLIS, J. The Attorney General appeals from an Ingham County Circuit Court judgment affirming an April 12, 1976, order of the Michigan Public Service Commission, which incorporated into Consumers Power Company's standard rules and regulations a purchased and net interchange power adjustment clause. The appeal also includes circuit court orders in about 35 other cases which approved monthly increases in the utility's electric rates pursuant to the purchased power adjustment clause.

The issue involved in the appeal is the statutory validity of the purchased and net interchange power adjustment clause, hereinafter referred to as the purchased power adjustment clause.

The case arises from consolidated proceedings before the Michigan Public Service Commission. On July 8, 1974, Consumers Power applied for authority to include purchased and interchange power costs in the fuel adjustment clause, which

_____

* Circuit judge, sitting on the Court of Appeals by assignment.

was then included in its electric rate schedules. That petition was docketed as MPSC Case No. U-4621. On May 28, 1975, Consumers Power filed an application to increase its electric rates annually by at least $118,000,000. That application was docketed as MPSC Case No. U-4840. On July 21, 1975, the commission consolidated the two cases and ordered further hearings on certain matters, including the company's request to authorize a purchased power adjustment clause. Thereafter, the commission held public hearings on the consolidated cases.

On April 12, 1976, the commission entered its final order in the consolidated cases. The decision allows the company to add to its rate schedules a clause permitting rate increases "to recognize in a timely manner increases or decreases in costs incurred or revenues received by applicant for the purchase or sale of electric energy". The commission allowed the amendment in recognition of the fact that "power pooling transactions are an integral part of the electrical utility business today" and because "this clause will operate in tandem with the FCAC [fuel cost adjustment clause] to assure that applicant has the incentive to provide the lowest cost available electric energy to its customers at all times". The commission was of the opinion that the FCAC and the purchased power adjustment clause should work in tandem to give the utility incentive to resort to the least costly alternative of either purchasing additional fuel for its own power generation or buying already-generated power from the power pool.

In authorizing the utility to adjust rates for purchased power and increased fuel costs, the commission limited the company to recovering only 90% of either cost as a further economic

incentive. The commission's reasoning is that: "In times of increasing costs, applicant will necessarily exert every effort to select the particular method of supplying electrical energy which will minimize the 10% portion of the costs which do not pass through either clause. In times of decreasing costs, applicant will similarly seek the mix which will maximize the reduction and improve revenue recoveries at the same time."

The decision requires that the company maintain a separate accounting for purchased power in order to "eliminate the possibility of any power sales revenue being overlooked in the calculation of the monthly adjustment. Such revenues will act as an offset to expenses incurred for purposes of the adjustment clause."

Recognizing that the Attorney General had ruled in 1974 that public utilities could not pass through the cost of purchased power without notice and hearing, OAG, 1973-1974, No 4844, p 205 (November 20, 1974), the commission set up an elaborate schedule for monthly notice and hearing for approval of purchased power cost adjustments. In addition, the hearing procedure also provides for semi-annual refunds "through operation of the two adjustment clauses if revenues collected through the combined effect of the clauses exceed 90% of the increase in expense incurred. This will insure a tracking of adjustment clause revenues with expense changes from the customer's point of view. No additional customer charges will be permitted if the review contemplated shows a lesser revenue collection than changes in expenses incurred. This refund procedure provides additional protection to the customer against any potential overcharge."

Finally, the commission's decision provides for a

three-month lag between the time that increased or decreased costs under the two adjustment clauses would be incurred and the time they would be billed or refunded to customers. Operating from 1975 test year data, the commission ordered that "the February 1976 fuel cost level should be 'rolled in' the energy charge and the base cost for the new fuel cost adjustment clause set at 11.98 mills per kWh and the base cost for the purchased and interchange power clause set at 2.55 mills per kWh to reflect applicant's level of purchases included for the 1975 test year and included in the 1975 staff adjustments used to establish rates in this proceeding."

Under the commission's decision, the first purchased power rate adjustment would take place for the July, 1976, billing. Notice of that adjustment was given and a hearing was conducted between June 15 and June 17, 1976. By an order entered June 28, 1976, the commission allowed a purchased power cost adjustment, beginning July, 1976, of 1.9 mills per kWh. Similar monthly hearings were held thereafter and continue to be held at this time. Between July, 1976, and February, 1982, for example, 40 increases in the cost of purchased power were allowed, 26 reductions were ordered and, in two instances, no orders were entered. The amounts of money involved under the purchased power adjustment clause are considerable. Through November, 1981, Consumers Power collected approximately $268,000,000 through purchased and net interchange power adjustments. Detroit Edison and other electric utilities in Michigan have also collected comparable amounts. These amounts represent 90% reimbursement for necessary expenditures actually made by the utilities in providing electric service to customers. The

purchased power adjustment capability is important, not only because large amounts of money are involved, but also because the commission found that "there has been increasing reliance on power pooling operations and applicant's position in recent years [has been] as a net buyer of electrical power from other utilities".

As noted, adjustments for purchased power are made after notice and hearing each month. In addition, under the commission's order, semi-annual reconciliations are conducted to even out increases and decreases in fuel costs and purchased power costs. If one or both costs have increased, then the utility recovers 90% of the increase and if one or both costs have decreased, the utility is required to refund 90% of the savings. For example, the six-month period between April and September, 1976, was reconciled at a hearing and by a June 6, 1977, order of the commission. As a result of that hearing, the commission ordered the company to refund $1,591,000 of overrecoveries by making a credit of .83 mills per kWh on July, 1977, billings. Similarly, in its July 19, 1979, reconciliation order, covering the period of January through June, 1978, the commission found that the company had an underrecovery of $5,315,627. However, the commission refused to approve an additional charge to cover that deficiency.

The Attorney General timely appealed the commission's April 12, 1976, order to Ingham County Circuit Court. The Attorney General also appealed about three dozen commission orders establishing increases in monthly billing adjustments pursuant to the purchased power adjustment clause. The circuit court affirmed.

On appeal, the Attorney General argues that the

purchased power adjustment clause procedure approved by the Public Service Commission violates the transmission of electricity act and the public service commission act in several respects. The Attorney General argues that the procedure violates § 7 of the transmission of electricity act, 1909 PA 106; MCL 460.551 *et seq.;* MSA 22.151 *et seq.* Section 7 sets out the procedure for rate-making for electric companies and provides, in part, that the Public Service Commission, in setting electric rates, shall consider "all lawful elements properly to be considered to enable it to determine the just and reasonable price to be fixed for supplying electricity, including cost, reasonable return on the fair value of all property used in the service, depreciation, obsolescence, risks of business, value of service to the consumer, the connected load, the hours of the day when used and the quantity used each month". MCL 460.557; MSA 22.157. The Attorney General argues that the purchased power adjustment clause violates that section by considering only one factor, cost of purchased power, rather than the several factors enumerated in the section.

The Attorney General also says that purchased power adjustments proceedings are contrary to the transmission of electricity act because they are not commenced by the utility's petition, as allegedly required by § 2, or by complaint, as allegedly required by § 7.

Finally, in his first issue the Attorney General contends that no purchased power adjustment can be authorized without an investigation and report by the commission's staff as allegedly required by § 6a(1) of the public service commission act, MCL 460.6a; MSA 22.13(6a).

There is no direct Michigan case law or statu-

tory authority on point. Nevertheless, it appears that establishment of a purchased power adjustment clause is within the commission's statutory power.

The Attorney General's position has validity if we assume that the only way in which the Public Service Commission can change a rate or rate schedule is by conducting a full-scale rate-making hearing, pursuant to all of the procedures specified by the transmission of electricity act and the public service commission act. But, that assumption ignores the very wide authority granted to the commission by statute to regulate public utilities in the state. It also ignores the fact that the very purpose of adjustment clauses, where they are authorized, is to by-pass normal rate-making procedures because they are expensive both for the utility and the regulatory agency, time-consuming, and frequently unnecessary, where the only rate factor changed is the cost of purchased power (or, frequently, fuel). The advantages of fuel adjustment clauses are set out in *Wisconsin's Environmental Decade, Inc v Public Service Comm,* 81 Wis 2d 344; 260 NW2d 712 (1978). The case also notes some disadvantages. Fuel adjustment clauses to an extent evade regulatory control and reduce public scrutiny of rate changes, and, because they typically involve factors which are under the partial control of the utility, automatic adjustment of rates to reflect changes in the cost of those controllable factors sometimes tends to result in the elimination of incentives to the utility to economize on the items and to seek greater efficiency. Many of the same advantages and disadvantages are equally applicable to purchased power adjustments, which are the subject of this appeal.

The question is whether Michigan statutes allow

the Public Service Commission to implement a purchased power adjustment clause. We hold that they do. The public service commission act confers broad discretion and authority on the Public Service Commission. It provides:

"(1) The public service commission is vested with complete power and jurisdiction to regulate all public utilities in the state except a municipally owned utility, the owner of a renewable resource power production facility as provided in section 6d, and except as otherwise restricted by law. The public service commission is vested with the power and jurisdiction to regulate all rates, fares, fees, charges, services, rules, conditions of service, and all other matters pertaining to the formation, operation, or direction of such public utilities. The public service commission is further granted the power and jurisdiction to hear and pass upon all matters pertaining to, necessary, or incident to the regulation of all public utilities, including electric light and power companies, whether private, corporate, or cooperative, gas companies, water, telephone, telegraph, oil, gas, and pipeline companies, motor carriers, and all public transportation and communication agencies other than railroads and railroad companies." MCL 460.6; MSA 22.13(6).

Furthermore, § 6a(2) of the public service commission act empowers the commission, as follows:

"(2) The commission shall adopt such rules and procedures for the filing, investigation and hearing of petitions or applications to increase or decrease utility rates and charges as the commission finds necessary or appropriate to enable it to reach a final decision with respect to such petitions or applications within a period of 9 months from the filing thereof. This section or any other law does not prohibit the incorporation of fuel or purchase gas adjustment clauses in rate schedules." MCL 460.6a; MSA 22.13(6a).

In light of that broad authority vested in the commission, it is reasonable to conclude that the commission can provide, as it has, for monthly purchased power adjustments in rates, after notice and hearing. The procedures established by the commission are in essential harmony with the notice and hearing requirements of both the transmission of electricity act and the public service commission act.

The Attorney General's contention that the commission is required to consider all elements of rate-making, as required by § 7 of the transmission of electricity act, is not persuasive. As Consumers Power argues, those factors are pertinent when what is before the commission is a utility request for an across-the-board rate increase. Where, however, only a change in the cost of purchased power is involved, it is not necessary to re-examine all of the factors which are involved in establishing the utility's rates. In *Trustees of Clark University v Dep't of Public Utilities,* 372 Mass 331; 361 NE2d 1285 (1977), the Supreme Judicial Court of Massachusetts held that a purchased power adjustment clause is intended to modify the rate to reflect a change in the cost of purchased power, without the necessity of submitting the case to a full-fledged rate-making hearing. The court pointed out that a purchased power adjustment is temporary because it will be eliminated at the next general rate hearing or when the next purchased power adjustment is approved. Similarly, in *Petition of Allied Power & Light Co,* 132 Vt 354; 321 A2d 7 (1974), the Supreme Court of Vermont pointed out that purchased power adjustments do not have to result in reexamination of the entire rate structure. The court said:

"In times of stable costs, a schedule may remain satisfactory for a considerable time. Even in times of

rapid economic change, not all factors involved in establishing fair rates of return may require constant review, if there is nothing about them that has been affected." 132 Vt 363.

In that case, the court held that purchased power adjustments had to be the subject of notice and hearing, that they could not be automatic. However, the court held, a complete new rate hearing was not required. The court said:

"Even so, in such circumstances of frequent change, to require on every occasion complete reexamination of the rate structure of a utility would be wasteful and redundant. Absent a demonstration of significant change, it would seem that the previously filed evidence on other aspects, as evaluated by previous Board decisions, should stand. This is an area where the Public Service Board's special competence should be allowed to operate." 132 Vt 364.

Adjustment clauses for the cost of fuel and purchased power have been approved almost universally by other states, mostly without the necessity of separate hearings. The rationale most frequently used is that changes in rates to reflect increases or decreases in the cost of fuel or purchased power are not changes in the rate schedules, which would ordinarily require a hearing before the regulatory body, but are, rather, a change computed according to a fixed mathematical formula. In one of the leading cases, *City of Norfolk v Virginia Electric & Power Co,* 197 Va 505; 90 SE2d 140 (1955), the court approved the use of a purchased gas adjustment clause, without the necessity of a separate hearing on each adjustment. The court said:

"The General Assembly has, as stated by Commis-

sioner Catterall in his memorandum opinion, 'recognized that rate schedules consist not merely of lists of rates in dollars and cents, but that they customarily include provisions that will in various ways affect the rates charged at the time of filing or to be charged thereafter.'

"The proposed escalator clause is nothing more or less than a fixed rule under which future rates to be charged the public are determined. It is simply an addition of a mathematical formula to the filed schedules of the Company under which the rates and charges fluctuate as the wholesale cost of gas to the Company fluctuates. Hence, the resulting rates under the escalator clause are as firmly fixed as if they were stated in terms of money." 197 Va 516.

Among the cases which have approved the adoption of fuel or purchased power adjustment clauses, or both, automatically or after an administrative hearing for each alteration, are *Trustees of Clark University v Dep't of Public Utilities, supra* (purchased power); *Petition of Allied Power & Light Co, supra* (fuel and purchased power); *Evansville v Southern Indiana Gas & Electric Co,* 167 Ind App 472; 339 NE2d 562 (1975) (fuel); *Consumers Organization for Fair Energy Equality, Inc v Dep't of Public Utilities,* 368 Mass 599; 335 NE2d 341 (1975) (fuel); *North Carolina ex rel Utilities Comm v Edmisten,* 26 NC App 662; 217 SE2d 201 (1975), *aff'd* 291 NC 361; 230 SE2d 671 (1976) (fuel); *City of Norfolk v Virginia Electric & Power Co, supra* (fuel); *United Gas Corp v Mississippi Public Service Comm,* 240 Miss 405; 127 So 2d 404 (1961) (fuel); *Chicago v Illinois Commerce Comm,* 13 Ill 2d 607; 150 NE2d 776 (1958) (fuel); see, generally, Foy, *Cost Adjustment in Utility Rate Schedules,* 13 Vand L Rev 663 (1960). Although those cases, and others like them, hold that fuel or purchased power adjustment clauses are permissible, with or

without separate hearings, they also expressly or impliedly recognize that the rate adjustments can be made solely on the basis of a change in the cost of fuel or power, without re-examining each time the other factors that go into full-scale rate-making. In this case, the Michigan Public Service Commission has gone a step further by requiring individual notice and hearing on each purchased power adjustment.

The Attorney General's complaint that purchased power adjustments are unlawful because there has been no petition or complaint is also rejected. Although not applicable in adjustment proceedings, §§ 2 and 7 were satisfied. Section 2 provides, in part, that "no public utility supplying electricity shall put into force any rate or charge for the same without first petitioning said commission for authority to initiate or put into force such rate or charge and securing the affirmative action of the commission approving said rate or charge". MCL 460.552; MSA 22.152. As a matter of fact, there was such a petition. Public Utility Case U-4621 was commenced by the utility on July 8, 1974, by a petition to amend its fuel cost adjustment clause to include a purchased power adjustment clause. The commission's July 21, 1975, opinion and order in that case reflects, in the first paragraph:

"On July 8, 1974, Consumers Power Company (applicant), filed an application for authority to amend the fuel adjustment clause in its electric rates schedules. The amendments proposed by applicant in its initial filing provided for, among other things, inclusion of purchased and interchanged power costs in its fuel adjustment clause and estimation of fuel and purchased and interchanged power costs so as to eliminate the two-month lag between the time costs were incurred

and the time the corresponding revenues were received."

That request was considered by the commission in the consolidated proceeding and resulted in its April 12, 1976, order, which authorized the purchased power adjustment clause. Once the commission authorized the utility to adjust rates to reflect increases and decreases in the cost of purchased power, the utility had "secure[d] the affirmative action of the commission approving said rate or charge", as required by § 2 of the transmission of electricity act. Once that authority was granted by the commission, a separate petition or separate complaint under §§ 2 or 7 of the transmission of electricity act was not required each time the utility sought approval to apply the purchased power adjustment clause. The authority to make such adjustments as granted by the commission became, in effect, a permanent part of the company's rates and schedules.

The Attorney General's contention that a staff investigation and report is necessary is rejected.

Section 6a(1) of the public service commission act provides, in part:

"[T]he commission * * * may in its discretion * * * enter an order granting partial and immediate relief * * *. Provided, That no such finding or order shall be authorized or approved ex parte, nor until the commission's technical staff has made an investigation and report." MCL 460.6a(1); MSA 22.13(6a)(1).

The commission's order in this case, authorizing a purchased power adjustment clause, was not "partial and immediate relief". It was final relief, amending Consumers Power Company's rate schedules to provide for purchased power adjust-

ments from time to time. As the utility argues, this part of § 6a is simply inapplicable. "Billing adjustments pursuant to the purchased power adjustment clause do not involve the granting of partial and immediate rate relief within the meaning of § 6a. Partial and immediate rate relief involves the grant by the commission of a portion of the total rate relief sought by a utility in a general rate case prior to the close of the evidentiary record where the commission finds on motion of the utility that interim rate relief should be authorized prior to issuance of a final order."

In a second issue, the Attorney General argues that the commission erred in applying the clause in later proceedings by refusing to consider any factors, other than increased cost of purchased power. At the evidentiary hearing on Consumers Power's first request for a purchased power adjustment, conducted in June of 1976, the Attorney General says he established through competent evidence that 77,507,160 kWh purchased by the company in April of 1976 was for the purpose of meeting the requirements of increased retail sales which occurred in April of 1976, as compared to a year earlier. The company realized a gross profit of $739,337 on the increased sales in April, 1976. The Attorney General argues that "the commission refused to consider crediting the ratepayers with any portion of the gross profits earned on the increased sales, while at the same time charging the ratepayers for the entire cost of the additional purchased power necessary to make those increased sales". It is "grossly unfair" and a denial of due process, the Attorney General argues, "to charge Consumers Power's customers in the June 28, 1976 order with the increased April 1976 purchased power expense, while at the same time

refusing to credit the customers with the increased revenues arising from the electric sales growth that occasioned the increased purchased power expense".

The Attorney General's contention is incorrect. The hearing in the combined case was conducted primarily on Consumers Power's May 28, 1975, application for a rate increase. During the process, the commission adjusted or normalized 1975 test year data and information to take into account future factors such as anticipated sales increases and the resulting effect on revenues and expenses. Therefore, when the commission allowed a rate increase by its April 12, 1976, order, it had already given appropriate recognition to factors affecting the company's gross profits from increased sales, including a reasonable estimate of increased sales for 1976. So, in a sense, the company's increased revenues and profits from increased sales in 1976 were already taken into account when the commission approved a rate increase by its April 12, 1976, order. Furthermore, the alleged increased revenues or increased gross profit from April, 1976, sales were presumably taken into account by the commission in its reconciliation process, which was also established by its April, 1976, order approving a purchased power cost adjustment clause.

"The [purchased power adjustment] hearings scheduled for the months of May and November shall include an additional determination as to the amount of an adjustment to customer bills in the following billing months *to offset any excess of revenues collected pursuant to the combined effect of the Fuel Cost Adjustment Clause and the Purchased and Interchange Power Clause during the billing period October through March and April through September, respectively."* (Emphasis supplied.)

As a matter of fact, the adjustments for the period between April and September, 1976, were the subject of a reconciliation hearing and order dated June 6, 1977. At that time, the commission ordered the utility to refund $1,591,000 of overrecoveries by making a credit of .83 mills per kWh on July, 1977, billings. That credit was made. As a result of this, it does not appear that the company's increased gross revenues or gross profits for April, 1976, sales were unrecognized or that the company was allowed an unfair profit by being permitted to keep both the increased revenues from sales and the increased rates occasioned by an upward purchased power adjustment.

The final argument made by the Attorney General is that the commission refused evidence which tended to show that the company paid more for purchased power to fill the Ludington pumped storage reservoir than it would have had to pay for additional electricity during peak demand hours when Ludington was generating electricity. The commission rejected the contention, finding: "The commission, after review of this record, is not able to state that economy energy was available in the needed amounts at the time the Attorney General asserts that such could have been purchased."

In answer, the utility indicates that: "The Attorney General's argument was rejected by the commission as purely speculative and unfounded in fact. The Attorney General presented no evidence to show that Consumers Power would have been able to buy sufficient amounts of power during the period of peak demand in which Ludington was operating."

The conclusion of the commission and the utility seems to be correct. At least, the Attorney Gener-

al's brief does not point to any evidence in the record establishing that "the resulting cost of Ludington power was greater than the price at which Consumers Power could have purchased additional electricity during the peak demand hours when Ludington was generating electricity".

The last point the Attorney General makes is that: "Subsequent to the June 28, 1976 order, the commission has continued to refuse to inquire into or make a determination as to whether Consumers Power is purchasing power from other utilities at the lowest possible cost, or whether a portion of the outside power purchases could be obviated to more efficient operation of the company."

That simple statement of the contention is insufficient to raise an arguable issue. No support for the contention is made, no citations to records of any subsequent hearings are given and no case law or statutory authority is cited. The mere statement of the argument is insufficient to require appellate resolution of the point. The issue is considered abandoned. See, for example, *Pelc v Bendix Machine Tool Corp,* 111 Mich App 343; 314 NW2d 614 (1981); *Swindlehurst v Resistance Welder Corp,* 110 Mich App 693; 313 NW2d 191 (1981).

The scope of appellate review of orders of the Public Service Commission is quite narrow. To begin with, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the commission are deemed, prima facie, to be lawful and reasonable. MCL 462.25; MSA 22.44; *Michigan Consolidated Gas Co v Public Service Comm,* 389 Mich 624; 209 NW2d 210 (1973); *Consumers Power Co v Public Service Comm,* 65 Mich App 73; 237 NW2d 189 (1975). The person attacking an order of the commission has

the burden of proving by clear and satisfactory evidence that the order complained of is unlawful or unreasonable. MCL 462.26; MSA 22.45; *Lansing v Public Service Comm,* 330 Mich 608; 48 NW2d 133 (1951); *Michigan Bell Telephone Co v Public Service Comm,* 85 Mich App 163; 270 NW2d 546 (1978).

In this appeal, the Attorney General has failed to demonstrate, clearly and satisfactorily, that the order of the commission approving the purchased power adjustment clause is unlawful. In light of the commission's broad authority to regulate rates and services of public utilities and, in particular, in light of the commission's authority to adopt rules and procedures for hearings on petitions to increase or decrease utility rates in an expeditious manner (§ 6a[a] of the public service commission act), it is concluded that the commission's order is authorized by statute.

Affirmed. No costs are awarded because the appeal involves questions of public importance.

D. E. HOLBROOK, P.J., concurs in the result only.