UNION CARBIDE CORPORATION v MICHIGAN PUBLIC SERVICE
COMMISSION

Docket No. 84639. Submitted March 19, 1986, at Lansing. Decided
July 8, 1986. Leave to appeal granted, 428 Mich —.

In July, 1981, Consumers Power Company filed a request with the
Public Service Commission to increase its electric rates by $339
million per year and also sought $178.3 million per year in
partial and immediate rate relief. The PSC staff filed a motion
for expedited partial final relief, seeking an order whereby the
uneconomic use of Consumers' Karn oil-fired generating units
would be prohibited. The PSC staff based its recommendation
that the uneconomic use of those units be prohibited on evi-
dence that: the Karn oil-fired units were being used during
other than peak demand hours; the nonpeak-hour use of the
Karn oil-fired units was a result of the need to use the oil
supplied by Union Carbide Corporation and Imperial Oil Com-
pany pursuant to requirement contracts entered into with
those oil suppliers by Consumers; the cost of power produced by
the oil-fired Karn units was well in excess of the cost of power
produced by Consumers coal-fired units or the cost of purchased
power; and the additional cost of operating the Karn units on
other than a peak demand basis was being passed on to
customers under the fuel-adjustment provisions and would cost
Consumers customers between $86 and $117 million per year.
The hearing officer refused to grant the PSC staff motion for
partial final relief relative to the operation of the Karn oil-fired
units. The staff brought an appeal to the PSC itself, which
granted the staff's motion. The PSC ordered that Consumers
cease purchasing fuel oil pursuant to the supply contracts with
Union Carbide and Imperial Oil except to the extent necessary
to operate the Karn units for peak demand purposes. Union
Carbide filed a complaint for review of the PSC's order in
Ingham Circuit Court, even though it had not intervened in the
proceedings held before the PSC. Consumers moved to intervene

REFERENCES

Am Jur 2d, Public Utilities §§ 134, 230-291.
See the annotations in the ALR3d/4th Quick Index under Public
Utilities.

as a party plaintiff. The PSC moved for dismissal as to Union Carbide on the ground that Union Carbide lacked standing to seek circuit court review because it had failed to participate in the proceedings before the PSC and moved for dismissal as to Consumers on the basis that the controlling statute spoke only in terms of intervening as a party defendant. The trial court, Carolyn Stell, J., rejected the standing arguments and found that the PSC lacked statutory authority to enter this order which interferred with the management prerogatives of Consumers. The PSC appealed. Consumers cross-appealed. *Held:*

1. Since Union Carbide's interests were clearly affected by the PSC's order, and since Union Carbide sought review in a timely fashion, the trial court properly determined that Union Carbide had standing to seek circuit court review of the PSC's order.

2. Since intervention by Consumers as a party plaintiff was in accordance with the provisions of the court rules, and since intervention is a matter of procedure which is governed by court rule, the trial court properly allowed Consumers to intervene as a party plaintiff in the circuit court review process.

3. Consumers was not denied due process of law by reason of the fact that the partial final order was granted without a full hearing.

4. The PSC has the statutory authority to require a public utility to cease to operate a power plant except on a peak demand basis where the operation of the plant results in excessive charges to customers because of fuel adjustment provisions which permit the public utility to automatically pass high fuel costs on to its customers. Since the purpose of the order requiring Consumers to cease to purchase fuel oil in excess of the amount necessary for peak operation was to promote the public good, there was no conflict with the constitutional prohibition against impairment of contracts.

Reversed.

1. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — APPEAL — STANDING.

A company having a contract to supply a fixed daily quantity of fuel oil to an electrical generating plant of a public utility has standing to bring an appeal in circuit court of an order of the Michigan Public Service Commission on an interim rate request by the public utility where, as part of the interim rate order, the utility was ordered to use the oil-fired generating plant only at peak demand times and the utility was relieved of

its contractual requirement to purchase fuel oil in excess of the amount necessary to meet those peak demands, even if the fuel oil company did not participate in the proceedings before the Public Service Commission (GCR 1963, 201.2).

2. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — APPEAL — INTERVENTION.

A utility company may intervene as a party plaintiff in a circuit court action brought by a fuel supplier challenging a Public Service Commission order which required the public utility to cease to honor a fuel contract with the fuel supplier, since intervention is a procedural matter which is governed by court rule and the court rules provide for intervention and provide that the relative position of the party which is intervening governs the manner in which the party is designated (GCR 1963, 201.1, 201.2, 206.1).

3. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — INTERIM RATE ORDERS — DUE PROCESS.

A public utility is not denied due process of law where the Public Service Commission enters an interim rate order based on less than a full and complete factual development, since adequate means of review of the interim rate order exists (MCL 460.6a; MSA 22.13[6a]).

4. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — CONTRACTS — IMPAIRMENT OF CONTRACTS — CONSTITUTIONAL LAW.

It is within the authority of the Public Service Commission as part of its rate-making power to order a public utility to operate an oil-fired electric power plant only on a peak demand basis where the operation of the oil-fired power plant is significantly more expensive than operation of coal-fired plants and to order the public utility relieved of its contractual obligation to accept the fixed daily amounts of fuel oil which necessitated the full time operation of the fuel-oil fired plants; since the order limiting the use of the oil-fired plants necessitating the modification of the oil supply contracts was for the general good of the public, there was no impairment of a contractual obligation within the meaning of the United States Constitution (US Const, art 1, § 10).

*Bodman, Longley & Dahling* (by *Theodore Souris, James A. Smith* and *John A. Shea*), and *Joseph E. Geoghan* and *Robert L. Crawford* (of Counsel), for Union Carbide Corporation.

*Lawrence B. Lindemer, Allen B. Bass* and *David A. Mikelonis,* and *Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *George W. Loomis, William D. Parsley* and *Michael G. Oliva*), for Consumers Power Company.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Don L. Keskey* and *Leo H. Friedman,* Assistant Attorneys General, for defendant.

Before: BEASLEY, P.J., and D. E. HOLBROOK, JR., and L. F. SIMMONS,* JJ.

PER CURIAM. The Public Service Commission (hereinafter commission) appeals as of right from an order of the Ingham Circuit Court which declared that a May 13, 1982, interim rate order issued by the commission in Case U-6923, to the extent that the commission's order prohibits Consumers Power Company from operating its Karn No. 3 and No. 4 oil-fired generating units in other than an economically advantageous manner, is beyond the scope of authority of the commission.

On July 2, 1981, Consumers filed its application with the commission for authority to increase its electric rates and charges by $339 million per year. Consumers also sought $178.3 million per year in partial and immediate rate relief.

At the time the application was filed, the established tariffs for electricity sold by Consumers contained a fuel adjustment clause. The clause permitted the automatic flow through to ratepayers of incremental fuel costs above the costs recognized when establishing base rate.

Following presentation by Consumers of evidence supporting its petition for interim rate re-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

lief, the commission staff filed a motion for an expedited partial final order relative to the uneconomic burning of fuel oil at the Karn plant. The motion was based on evidence already introduced, which showed that the Karn No. 3 and No.4 oil-fired generating units were being utilized during other than peak demand hours. The cost of generating the electricity by this method was $83.54 per Mwh, compared to $26.67 per Mwh which it cost Consumers to produce electricity at its Campbell No. 3 coal-fired plant and a forecasted purchased power average unit cost of $33.99 per Mwh. The staff, in its motion, contended that ceasing uneconomic operation of the Karn units would reduce overall fuel and purchase power expenses by $96 to $130 million per year, which at the ninety percent fuel adjustment clause rate would reduce the cost to ratepayers by $86 to $117 million per year.

In addition to the fuel costs, uneconomic operation of the Karn units had an impact on Consumers base rates of $9.6 million, according to the commission staff. The staff contended that ratepayers had already been subjected to substantial overcharges as a result of the uneconomic operation of the Karn units, approximating $34 million during the 1980 fiscal year and $50 million during the nine months of 1981.

The hearing officer refused to grant the relief the commission staff had requested. The staff then took an interlocutory appeal to the commission itself which, after briefs were submitted by interested parties, upheld the staff position. In so doing, the commission recognized that Consumers had entered into requirements contracts with Union Carbide Corporation and Imperial Oil Company whereby it had agreed to purchase a minimum number of barrels of low sulfur fuel oil for the

Karn plant on a daily basis. The commission ordered Consumers to cease purchasing fuel pursuant to these contracts, except to the extent necessary to operate the Karn units for peak demand purposes.

Although Union Carbide had been aware of the pendency of issues concerning the Karn supply contracts, it chose not to intervene at the commission level. When the commission entered its final interim order, however, Union Carbide filed a complaint for review in Ingham Circuit Court pursuant to MCL 462.26(a); MSA 22.45 and MCL 460.59; MSA 22.9. Consumers promptly moved to intervene as party plaintiff in that suit, and filed a separate complaint on its own behalf for review of the same commission order. That latter petition, subsequent to the circuit court's order herein, was dismissed for lack of progress.

The commission moved for dismissal on the ground that Union Carbide lacked standing to initiate a review action in circuit court when it had not participated, after notice, in commission proceedings, and similarly moved for dismissal of the attempt by Consumers to intervene as a party plaintiff with Union Carbide on the ground that the controlling statute allows intervention only on the defense side.[1]

The circuit court rejected these standing arguments, turned to the merits, and found that the commission lacked statutory authority to enter the order which affected the operation of the Karn plant and, further, found that the commission's order constituted an improper governmental interference in the management prerogatives of Consumers. The circuit court, therefore, chose not to

---

[1] In relevant part, the statute, MCL 462.26(a); MSA 22.45, states: "The Commission shall file its answer, and on leave of court any interested party may file an answer to said complaint."

address, as moot, the argument by Consumers that the commission's order violated due process because it was entered without a full hearing. It is this issue which is the subject of a cross-appeal filed by Consumers.

I. DID THE CIRCUIT COURT ERR IN HOLDING THAT UNION CARBIDE CORPORATION HAD STANDING TO FILE A COMPLAINT FOR REVIEW OF THE PUBLIC SERVICE COMMISSION'S DECISION AFFECTING THE KARN OIL FIRED UNITS, AS TO WHICH UNION CARBIDE WAS A REQUIREMENTS SUPPLIER AND IN ALLOWING CONSUMERS POWER TO INTERVENE AS PARTY PLAINTIFF?

When circuit court review was commenced in 1982, the applicable court rule was GCR 1963, 201.2, which in pertinent part provided:

> Every action shall be prosecuted in the name of the real party in interest; but . . . a party with whom or in whose name a contract has been made for the benefit of another . . . may sue in his own name without joining with him the party for whose benefit the action was brought . . . .

Under the federal rules, which are the source of GCR 1963, 201.2, a person whose interests have been affected by a judgment or administrative decision has the right to initiate or continue appellate review proceedings, even though postadjudicative intervention would not be allowed for the purpose of reopening proceedings in the trial forum.

The leading case is *Pellegrino v Nesbit,* 203 F2d 463 (CA 9, 1953), in which stockholders were permitted to intervene after judgment had been rendered in favor of corporate directors in a suit brought by the corporation under Rule 16(b) of the

Securities & Exchange Commission. In reversing a denial of the motion to intervene, the court said:

> It is clear from what has already been said, that intervention should have been granted under Rule 24(a)(2) of the Federal Rules of Civil Procedure, because representation of appellant's interest is "inadequate," appellee corporation having decided not to appeal from the judgments of the trial court, and appellants will be "bound by a judgment in the action." . . .
>
> We have discussed the judgments of the district courts on the merits only to the extent thought necessary to show that the corporation's decision not to appeal from such judgments constituted a failure diligently to prosecute the suits since the correctness of the judgments presented substantial and important questions of law. [203 F2d at 468.]

A majority of cases permitting postjudgment intervention have "typically involved a refusal or unwillingness by the losing party to diligently prosecute the lawsuit, this fact not becoming apparent until after the court's decision." *United States v Blue Chip Stamp Co*, 272 F Supp 432, 436 (CD Cal, 1967), aff'd sub nom *Thrifty Shoppers Script Co v United States*, 389 US 580; 88 S Ct 693; 19 L Ed 2d 781 (1968). Examples include *Pellegrino v Nesbit, supra; Wolpe v Poretsky*, 79 US App DC 141; 144 F2d 505 (1944), cert den 323 US 777; 65 S Ct 190; 89 L Ed 621 (1944) (intervention granted for purposes of prosecuting appeal because affected property owners did not learn until after judgment that the zoning commission did not intend to appeal an adverse judgment), *Hurd v Illinois Bell Telephone Co*, 234 F2d 942 (CA 7, 1956) (intervention granted at appellate level where, in a spurious class action, it appeared that certain members of the class doubted the faithfulness of the named plaintiff in prosecuting

the appeal on behalf of the class), and *Cascade Natural Gas Corp v El Paso Natural Gas Co,* 386 US 129; 87 S Ct 932; 17 L Ed 2d 814 (1967).

In the *Cascade Natural Gas Corp* case, the Supreme Court reversed a district court decision denying postjudgment intervention where the intervenors were not satisfied with the trial court's decree as shaped with the consent of the Attorney General of the United States who had, in essence, represented intervenor's position. 386 US 136. The dissent is instructive because it describes the principle adopted by the majority in this language:

> If, after the existing parties have settled the case or pursued litigation to the end, some volunteer comes along who disagrees with the parties' assessment of the issues or the way they have pursued their respective interests, intervention must be granted to the volunteer as of right. [386 US 155.]

That notion was expanded and generalized into a settled principle by the decision in *United Airlines, Inc v McDonald,* 432 US 385, 394-396; 97 S Ct 2464; 53 L Ed 2d 423 (1977), where the Court held:

> The critical fact here is that once the entry of final judgment made the adverse class determination appealable, the respondent quickly sought to enter the litigation. In short, as soon as it became clear to the respondent that the interests of the unnamed class members would no longer be protected by the named class representatives, she promptly moved to intervene to protect those interests.
>
> \*   \*   \*
>
> Our conclusion is consistent with several decisions of the federal courts permitting post-judgment intervention for the purpose of appeal.[16] The

critical inquiry in every such case is whether in view of all the circumstances the intervenor acted promptly after the entry of final judgment. Cf. *NAACP v New York,* 413 US 345, 366; 93 S Ct 2591; 37 L Ed 2d 648 (1973). Here, the respondent filed her motion within the time period in which the named plaintiffs could have taken an appeal. We therefore conclude that the Court of Appeals was correct in ruling that the respondent's motion to intervene was timely filed and should have been granted.

---

[16] A case closely in point is *American Brake Shoe & Foundry Co v Interborough Rapid Transit Co,* 3 FRD 162 (SD NY, 1942). That case involved a plan for reorganization of the Interborough Rapid Transit Co. and for its consolidation with the Manhatten Elevated Railway. Mannheim, an owner of a series of bonds in the Manhattan Railway, had participated in the District Court not merely representing his own interests but also acting as "attorney in fact" for other owners of the bonds. After the District Court had approved the plan as fair and equitable, and had subsequently ordered its implementation, Mannheim filed a notice of appeal. He then decided to abandon the appeal and to seek to surrender his bonds pursuant to the terms of the plan. One of the other holders of the same series of bonds, for whom Mannheim had been acting as attorney-in-fact, then moved to intervene for the purpose of prosecuting an appeal on behalf of herself and all other nonsurrendering bondholders. Noting that it is "essential in the administration of our system of justice, that litigants should have their day in court" and that the motion was filed within the time in which an appeal might have been brought, the District Court ruled that the motion to intervene was timely. *Id.,* at 164.

The decision in *Pellegrino v Nesbit,* 203 F2d 463 (CA 9, 1953), is also similar to the case at bar. There a corporation had filed an action against corporate officers under § 16 (b) of the Securities Exchange Act of 1934, 15 USC § 78p(b) [15 USCS § 78p(b)] for recovery of short-swing profits. The District Court entered judgment for the defendants, and when the corporation failed to appeal, a shareholder sought to intervene for the purpose of appealing from the District Court decision. The Court of Appeals, reversing the District Court, ruled that the motion was timely and that intervention should have been permitted. 203 F2d, at 465-466.

Post-judgment intervention for the purpsoe of appeal has been found to be timely even in litigation that is not representative in nature, and in which the intervenor might therefore be thought to have a less direct interest in participation in the appellate phase. See, *e.g., Hodgson v United Mine Workers,* 153 US App DC 407, 417-419; 473 F2d 118, 129 (1972); *Smuck v Hobson,* 132 US App DC 372, 378-379; 408 F2d 175, 181-182

(1969); *Zuber v Allen,* 128 US App DC 297; 387 F2d 862 (1967), discussed in *Hobson v Hansen,* 44 FRD 18, 29-30, n 10 (DC, 1968); *Wolpe v Poretsky,* 79 US App DC 141, 144; 144 F2d 505, 508 (1944); *United States Cas Co v Taylor,* 64 F2d 521, 526-527 (CA 4, 1933).

   Insofar as the motions to intervene in these cases were made within the applicable time for filing an appeal, they are consistent with our opinion and judgment in the present case.

---

In the present case, Union Carbide sought review of the commission's order within the thirty-day time limit allowed by statute. Its interests were clearly adversely affected by the commission's decision, which amounted to an abrogation of its oil supply contract with Consumers for the Karn No. 3 and No. 4 units. It would almost certainly have been an abuse of discretion for the circuit court to dismiss the complaint for lack of standing; it was certainly a proper exercise of the circuit court's discretion to permit the complaint to proceed on the merits.

The circuit court also correctly allowed Consumers to intervene as party plaintiff. Despite the statutory language already quoted ("on leave of court any interested party may file an answer to said complaint"), neither the statute nor logic compels the conclusion that parties may intervene only as defendants. Intervention is a question of procedure, and therefore governed by court rule. *Brown v Porter,* 13 Mich App 6; 163 NW2d 709 (1968). Intervention was at least permissive pursuant to GCR 1963, 201.2 and 206.1, and the circuit court did not abuse its discretion in permitting Consumers to join as party plaintiff. It is the relative position of a party, and not whether its pleadings may be denominated a "complaint," "answer," "reply," "traverse," "replication," or something else, that governs the manner in which a party is to be designated. GCR 1963, 201.1.

There is also merit to the contention by Consumers that, whether it intervened in the statutory proceedings initiated by Union Carbide, pursued its own separately initiated statutory proceeding raising the same issue, or had that separate statutory proceeding consolidated pursuant to MCR 2.505, the result would have been unchanged. The issue thus becomes one of form, not of substance, and provides no basis for substantive appellate relief. MCR 1.105.

II. DID THE COMMISSION DEPRIVE CONSUMERS POWER COMPANY OF DUE PROCESS OF LAW IN MAKING AN INTERIM ORDER BASED ON LESS THAN FULL AND COMPLETE FACTUAL DEVELOPMENT?

It must be borne in mind that it was Consumers which sought interim rate relief in the amount of $178.3 million. The commission staff's position regarding the Karn oil-fired generating units was, in essence, that the interim rate relief request should be granted, but that any amount thereof attributable to uneconomic operation of the Karn plant should be disallowed.

In granting interim rate relief, the commission operates pursuant to § 6a of the Public Service Commission Act, MCL 460.6a; MSA 22.13(6a), which the Supreme Court has construed as follows:

> Both the language used to describe the conditions for the issuance of an interim order and its secondary and incidental place in the context in which it is found in subsection (1) suggests that the "partial and immediate" order is intended to be interlocutory, intermediate, and emergency relief, not required to be sustained at the time of the issuance by the same quality of procedural process and substantive proof as is required by § 85 to support a "final" permanent rate order.

\* \* \*

Because in our judgment the commission is required to conduct a less exhaustive hearing before granting partial and immediate rate relief "pending the submission of all proofs by interested parties", its discretion in granting such relief is to be reviewed upon a less demanding standard of review: the "unlawful or unreasonable" test of MCL 462.26(a); MSA 22.45(a). . . . It is obvious that if the interim order is to be entered before the whole record is made, it cannot be reviewable upon a standard of "competent, material and substantial evidence on the whole record."

We are satisfied that the availability of immediate review under the "unlawful or unreasonable" test of § 26 is sufficient to protect the interests of both the utilities and utility customers alike and, at the same time, comply with the intent of the Legislature that the interim rate order be subject to prompt judicial scrutiny. Further protection, of course, is provided by way of an appeal from any final order of the commission which fails to direct payment of refunds when they are justified. [*Great Lakes Steel Division of National Steel Corp v Public Service Comm,* 416 Mich 166, 181-183; 330 NW2d 380 (1982).]

Consumers, therefore, enjoyed all the process which was due with respect to an interim order of this nature.

### III. IS THE COMMISSION'S ORDER UNLAWFUL AS BEING IN EXCESS OR ITS STATUTORY AUTHORITY, OR AS VIOLATING THE OBLIGATION OF CONTRACTS CLAUSE, U S CONST, ART 1, § 10?

The commission relies on MCL 460.16; MSA 22.13(6), which provides:

The public service commission is vested with complete power and jurisdiction to regulate all

public utilities in the state . . . to regulate all rates, fares, fees, charges, services, rules, conditions of service, and all other matters pertaining to the formation, operation, or direction of such public utilities. The public service commission is further granted the power and jurisdiction to hear and pass upon all matters pertaining to, necessary, or incident to the regulation of all public utilities, including electric light and power companies . . . .

However, that broad statutory language furnishes no grant of specific powers to the commission, but merely outlines its jurisdiction. *Huron Portland Cement Co v Public Service Comm,* 351 Mich 255, 263; 88 NW2d 492 (1958).

Consumers counters that, while the state may regulate with a view to enforcing reasonable rates and charges, the state is not the owner of the property of public utility companies and is not clothed with the general power of management incident to ownership. *Michigan Public Utilities Comm v Michigan State Telephone Co,* 228 Mich 658, 671; 200 NW 749 (1924), quoting *Missouri ex rel Southwestern Bell Telephone Co v Public Service Comm,* 262 US 276; 43 S Ct 544; 67 L Ed 981 (1923).

This Court in similar cases has found implicit authority in the commission to adopt similar programs for limiting utility rates and charges. In *Attorney General v Public Service Comm #1,* 133 Mich App 719, 727; 349 NW2d 539 (1984), this Court found lawful the commission's adoption of an Operations and Maintenance Expense Indexing System, an indexing method which allowed rate adjustments based on certain utility maintenance and operation expenses. In *Attorney General v Public Service Comm,* 122 Mich App 777, 785-788; 333 NW2d 131 (1983), this Court upheld both purchased power adjustment and fuel purchase

adjustment clauses, not on the basis of any specific statutory authority, but on grounds that such rate regulation methods are reasonable and therefore within the implicit power of the commission.

Having created a fuel purchase adjustment clause for Consumers, the commission was within its authority in the present case to create an exception to that automatic pass-through for an oil-fired plant being used in an uneconomic manner, i.e., for other than peak load conditions. There is, of course, an established national policy against using either natural gas or oil to generate electricity, e.g., 42 USC 6201(6); such fuels are, however, required for standby type generating facilities such as the Karn No. 3 and No. 4 units, which must be brought on-line as demand peaks. Coal-fired plants do not have the ability to be kept efficiently in a standby condition. Thus, coal plants are used as main generating facilities, with oil-fired and gas-fired generation capacity supplementing them during peak hours.

The commission correctly recognized that the Karn units were being subjected to "forced burns," i.e., being used to generate electricity at other than peak hours, but at peak prices, because of Consumers obligation to take delivery of a fixed number of barrels of fuel oil a day. The commission properly acted to protect ratepayers from this kind of mismanagement.

There is no merit to the plaintiffs' contention that, in doing so, the commission impaired the obligation of the contract between Consumers and Union Carbide Corporation in violation of U S Const, art 1, § 10. As the Supreme Court of the United States held in *Arkansas Natural Gas Co v Arkansas Railroad Comm,* 261 US 379, 382-383; 43 S Ct 387; 67 L Ed 705 (1923):

While a state may exercise its legislative power to regulate public utilities and fix rates, notwithstanding the effect may be to modify or abrogate private contracts (*Union Dry Goods Co v Georgia Public Service Corp,* 248 US 372, 375; 39 S Ct 117; 63 L Ed 309 [1919]; *Producer's Transport Co v Railroad Comm,* 251 US 228, 232; 40 S Ct 131; 64 L Ed 239 [1920]), there is, quite clearly, no principle which imposes an obligation to do so merely to relieve a contracting party from the burdens of an improvident undertaking. The power to fix rates, when exerted, is for the public welfare, to which private contracts must yield; but it is not an independent legislative function to vary or set aside such contracts, however unwise and unprofitable they may be. Indeed, the exertion of legislative power solely to that end is precluded by the contract-impairment clause of the Constitution. The power does not exist per se. It is the intervention of the public interest which justifies, and at the same time, conditions, its exercise.

In the cited case of *Union Dry Goods Co v Georgia Public Service Corp,* the same Court said:

That private contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict, has been often decided by this court. Thus, in *Manigault v Springs,* 199 US 473, 480 [26 S Ct 127; 50 L Ed 274 (1905)], it was declared that:

"It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the state from [properly] exercising such powers . . . for the general good of the public though contracts previously entered into between individuals may thereby be affected."

This on authority of many cases which are cited.

In *Hudson County Water Co v McCarter,* 209 US 349, 357 [28 S Ct 529; 52 L Ed 828; 14 Ann Cas 560 (1908)], it is said that:

"One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them. The contract will carry with it the infirmity of the subject matter."

In *Louisville & Nashville R R Co v Mottley,* 219 US 467, 482 [31 S Ct 265; 55 L Ed 297; 34 ALR (n.s.) 671 (1911)], this is quoted with approval from *Knox v Lee* [79 US] 12 Wall 457, 550-551 [20 L Ed 287 (1870)], viz.:

"Contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to the defeat of legitimate government authority." [248 US 375-376.]

Thus, the contract between Union Carbide and Consumers respecting fuel oil requirements at the Karn No. 3 and No. 4 units is, and always has been, subject to limitation or abrogation by the commission in the public interest. No contention can be made that the Karn units were, in fact, being operated in an economically efficient manner. This is not a situation in which operation of the Karn units "out of economic order" occurred only sporadically, in an overall scheme of efficient and economically rational operation. Instead, the Karn units, designed to be used only during periods of peak demand, were operated excessively, in a manner designed to generate maximum profits for fuel oil suppliers and Consumers, but in violation of the public interest. The contracts clause of the United States Constitution provides no succor either to Union Carbide or Consumers on the facts of this case.

The decision of the circuit court, setting aside those portions of the commission's order governing the Karn plant and its relevant fuel supply contracts, is reversed and the decision of the commission is reinstated in full.