UNION CARBIDE CORPORATION v PUBLIC SERVICE
COMMISSION

Docket Nos. 79148, 79150. Argued March 8, 1988 (Calendar No. 1).
Decided August 23, 1988. Rehearing denied *post,* 1207.

In July, 1981, Consumers Power Company applied to the Public
Service Commission to increase its electric rates and moved for
partial and immediate interim rate relief. In its notice of
hearing, the commission indicated that it had commenced an
investigation on its own of the reasonableness and adequacy of
Consumers' existing rates. Prior to hearings on Consumers'
interim motion, the commission staff moved for an expedited
partial final order to prevent Consumers from continuing to
operate its Karn No. 3 and No. 4 oil-fired generating units out
of economic order, i.e., operating units which are more expen-
sive to run when a unit that can be operated at a more
reasonable cost is available. The commission staff calculated
that because of such operation, Consumers had overcharged
ratepayers, and recommended the disallowance of expenses
incurred by Consumers as a result of noneconomic operation
and an order requiring Consumers to cease the noneconomic
operation of the units. It additionally recommended that Con-
sumers be ordered to attempt to terminate or renegotiate fuel
oil contracts with Union Carbide Corp. A hearing referee
denied the staff's motion. Thereafter the commission issued a
partial final order granting Consumers' motion for interim
relief, requiring Consumers to cease operation of its Karn No. 3
and No. 4 units out of economic order and to cease taking fuel
deliveries from Union Carbide in excess of the amounts re-
quired for economic operation of the units, and disallowing fuel
expenses incurred while operating the units out of economic
order.

Union Carbide, which was not a party before the commission,
then brought an action in the Ingham Circuit Court against the
Public Service Commission, seeking a stay and vacation of the
commission's partial final order, arguing that the commission

References

Am Jur 2d, Public Utilities § 240.
See the Index to Annotations under Utilities.

exceeded its statutory authority in issuing the partial final order. Consumers intervened as party plaintiff. The court, Carolyn Stell, J., granted summary judgment for Union Carbide, holding that the commission had shown no statutory basis for its order and that its order was an unauthorized interference with Consumers' management. The Court of Appeals, BEASLEY, P.J., and HOLBROOK, JR., and L. F. SIMMONS, JJ., reversed in an opinion per curiam, concluding that the commission had acted within its authority (Docket No. 84639). The plaintiffs appeal.

In a unanimous opinion by Justice BRICKLEY, the Supreme Court *held:*

The Public Service Commission exceeded its statutory authority by ordering Consumers Power Company to stop operating its Karn units out of economic order and to limit its acceptance of oil deliveries from Union Carbide to those required for economic operation.

1. The Public Service Commission, among other powers granted by statute, has the power generally to regulate public utilities, including utility rates and charges. The power to fix and regulate rates, however, does not carry with it, explicitly or implicitly, the power to make management decisions.

2. In this case, the commission acted within its powers in preventing Consumers from passing on to ratepayers additional fuel expenses incurred in operating the Karn units out of economic order. However, in ordering Consumers to stop operating the units out of economic order and to limit acceptance of oil deliveries from Union Carbide, the commission exceeded its ratemaking authority. None of the statutory provisions offered by the commission supports its argument that it possessed such authority. The provisions cited either do not apply to the facts of the case or do not confer the power to make management decisions with the same degree of specificity that the Legislature used in conferring upon the commission the authority to set utility rates.

Reversed.

153 Mich App 217; 395 NW2d 292 (1986) reversed.

PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — JURISDICTION.

The Public Service Commission is vested with the power to regulate public utilities, including utility rates and charges; the power to fix just and reasonable rates, however, does not carry with it, explicitly or implicitly, the power to make management decisions (MCL 460.6[1]; MSA 22.13[6][1]).

*Bodman, Longley & Dahling* (by *Theodore*

*Souris, James A. Smith,* and *Kim Michael Lavalle*) and *Joseph E. Geoghan,* General Counsel, and *Robert L. Crawford,* Division Attorney, for the plaintiff.

*Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *George W. Loomis, William D. Parsley,* and *Michael G. Oliva*) and *S. Kinnie Smith, David A. Mikelonis,* and *Allen B. Bass* for the intervening plaintiff-appellant.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Don L. Keskey,* Assistant Attorney General, for the defendant.

Amici Curiae:

*Solomon Bienenfeld* and *A. Robert Pierce, Jr.,* for The Detroit Edison Company.

*Foster, Swift, Collins & Coey, P.C.* (by *David W. McKeague, Glen A. Schmiege,* and *Matthew F. Pausch*), for Michigan Oil and Gas Association.

*Robert G. Teeter* for Shell Western E & P, Inc.

*John P. Boerschig* for Amoco Production Company.

*George D. Bennett* for Union Oil Company of California.

BRICKLEY, J. This case presents two questions. First, did the Public Service Commission exceed its statutory authority in ordering Consumers Power Company to cease noneconomic operation of its Karn oil-fired generating plants and to limit acceptance of oil deliveries under its contract with Union Carbide? Second, did the commission's order

impair the contractual obligation of Union Carbide to provide oil to Consumers Power?

We hold that, in this case, the commission exceeded its statutory authority by ordering Consumers Power to stop operating its Karn units out of economic order and to limit its acceptance of oil deliveries from Union Carbide to those required for economic operation. Since we resolve this case on the basis of statutory authority, we need not reach the constitutional question of impairment of contractual obligation. Therefore, we reverse the judgment of the Court of Appeals and reinstate the judgment of the Ingham Circuit Court.

## I. FACTS

The controversy in this case originated in July of 1981 with Consumers Power Company's application to the Public Service Commission for an increase in Consumers' electric rates. Concurrent with its application, Consumers moved the commission for partial and immediate rate relief, seeking an increase of $339 million annually and a minimum interim increase of not less than $178.3 million. In its notice of hearing, issued on July 28, 1981, however, the commission noted that it had commenced, on its own motion,

> an investigation into the existing electric rates, charges, revenue deficiencies or excesses, services, practices, procedures and operations of Consumers Power Company, and the investigation will not necessarily be confined to matters contained in the application but will include all matters pertaining to the reasonableness and justness of Applicant's electric rates, charges, operations and practices as may be necessary to enable the Commission to determine whether the existing or proposed rates and charges are unreasonable and excessive or

inadequate and should therefore be increased, reduced or altered.

Hearings before hearing referee James Rigas began in September of 1981 and continued into 1982. On February 17, 1982, prior to the hearing on Consumers' motion for interim rate relief, the commission staff filed a motion for an expedited partial final order. The staff sought to prevent Consumers from continuing to operate the Karn No. 3 and No. 4 oil-fired generating units "out of economic order."[1] In its motion, the commission staff calculated that Consumers had overcharged its ratepayers approximately $84 million because of Consumers' uneconomic operation of the Karn No. 3 and No. 4 units. In addition, the commission staff projected that continued operation of the Karn No. 3 and No. 4 units in a noneconomic manner would cost Consumers' ratepayers an additional $86 million in 1982. Since a reconciliation of the added fuel expenses "passed through"[2] to rate-

---

[1] Operating a plant "out of economic order" means

> depart[ing] from the commonly accepted practice of placing on-line units with the cheapest fuel costs first and "building up" as the load increases, and then taking off the most expensive plants first when load decreases. Uneconomic operation thus occurs when an expensive unit is operated even though a more reasonable cost unit is available to the system at the same time.

[2] Under both the fuel cost adjustment clause and the purchased and net interchange adjustment clause, Consumers "passed through" to ratepayers ninety percent of its increased fuel and purchased and net interchange power expenses; Consumers bore ten percent of these increased costs.

> The commission was of the opinion that the [fuel cost adjustment clause] and the purchased power adjustment clause [would] work in tandem to give the utility incentive to resort to the least costly alternative of either purchasing additional fuel for its own power generation or buying already-generated power from the power pool. [*Attorney General v Public Service Comm*, 122 Mich App 777, 781; 333 NW2d 131 (1983).]

payers would not occur until after Consumers had incurred these expenses, and since the possibility of the commission entering a final order before the reconciliation hearing was remote, the staff concluded that a partial final order was necessary to prevent "irreparable harm" to the ratepayers and to Consumers.

> The uncontroverted competent material and substantial evidence on the record as described hereinafter establishes: 1) that Consumers will be forced to purchase oil under its contracts with Imperial Oil Company and Union Carbide Company for the Karn units; 2) that it will operate the Karn units in a noneconomic manner; and, 3) that its customers will be required to pay hundreds of millions of dollars for the uneconomic operation of the Karn units under its authorized fuel and purchased and net interchange power adjustment clauses, unless the Commission exercises its authority on an expeditious basis and orders Consumers to cease operating the Karn units in said fashion.

As a result, the commission staff recommended not only that the commission disallow any expenses Consumers incurred while operating Karn No. 3 and No. 4 in a noneconomic manner, but that the commission order Consumers to cease operating its Karn No. 3 and No. 4 units out of economic order.

> WHEREFORE, it is respectfully requested that the [hearing referee] recommend and the Commission enter an Order as follows:
> (a) That Consumers Power Company not operate

---

In 1982 PA 304, the Legislature amended the Public Service Commission act to disallow the use of fuel adjustment clauses. See MCL 460.6a; MSA 22.13(6a); see also *Detroit Edison v Public Service Comm*, 416 Mich 510, 525, n 1; 331 NW2d 159 (1982) (LEVIN, J., dissenting).

the Karn 3 and Karn 4 oil-fired generating facili-
ties out of economic order;

   (b) That any expenses incurred while operating
Karn 3 and 4 out of economic order shall be
disallowed and not passed through to the ratepay-
ers;

   (c) That Consumers Power Company immedi-
ately attempt to seek termination and/or renegoti-
ation of its oil contracts with Imperial Oil Limited
of Toronto and Union Carbide Company, and ad-
vise the Commission of said negotiations; and

   (d) That Consumers Power Company not pur-
chase any oil for the Karn 3 and 4 units, until a
need for the same can be demonstrated to the
Commission, and an appropriate order issues.

   In response, Consumers filed procedural objec-
tions to the commission staff's motion for an expe-
dited partial final order. Consumers argued, in
part, that "the Staff's proposed procedure [was]
entirely without precedent." On March 1, 1982,[3]
the hearing referee denied the staff's motion for an
expedited final order. The staff then filed an ap-
peal with the commission of the hearing referee's
denial of the motion.

   On May 13, 1982, the commission issued a par-
tial final order which granted both Consumers'
motion for interim relief as well as the staff's
application for leave to appeal.

   The granting of Staff's Application for Leave to
   Appeal does not result in a delay of the hearing on
   Applicant's application for rate relief. There is no
   necessity for separating this matter into a sepa-
   rate docket, since all the necessary parties were
   present and the record has been made upon the
   uncontroverted evidence established by Applicant's

   [3] The hearing referee denied the motion immediately following the
hearing on Consumers' motion for interim rate relief, which took
place between February 23 and March 1, 1982.

witnesses. Furthermore, the requisite exhibits have been marked and received into evidence.

Based on [sic] the preceding discussion, the Commission finds that the Staff's Application for Leave to Appeal should be granted and that Applicant shall cease taking deliveries under the aforementioned contracts in excess of quantities necessary for operating those units at levels required by economic dispatch of the system. Applicant shall also cease operation out of economic order. Any additional fuel expenses incurred while operating the Karn #3 and #4 oil-fired generating units out of economic order shall be disallowed and not passed on to ratepayers unless Applicant demonstrates the reasonableness of its actions from this date forward. The Staff's recommended adjustment to fuel and purchased and net interchange power expense to reflect economic operation of Karn #3 and #4 is reasonable for the purpose of determining partial and immediate relief.

Approximately two weeks later, on May 28, 1982, Union Carbide, which was not a party before the commission, filed a complaint and motion in the Ingham Circuit Court, asking the court to stay and vacate the commission's partial final order. Union Carbide argued, in part, that the commission exceeded its statutory authority in ordering Consumers to not operate its Karn No. 3 and No. 4 plants out of economic order and to cease taking deliveries of oil under its contract with Union Carbide. Union Carbide also claimed that the commission's order impaired its contractual obligation to supply oil to Consumers, in contravention of art I, § 10 of the United States Constitution and art 1, § 10 of the Michigan Constitution.

Subsequently, Consumers intervened as a party plaintiff in the Ingham Circuit Court action. On June 10, 1982, Ingham Circuit Court Judge Giddings entered a stay during the litigation, limited

to those portions of the commission's order which precluded noneconomic operation of the Karn units and acceptance of oil under the Union Carbide-Consumers Power contract.[4] Thereafter, both Union Carbide and the commission filed their respective motions for summary judgment, the commission claiming that Union Carbide's complaint failed to state a claim upon which to grant relief and Union Carbide arguing, in part, that the commission's order exceeded its statutory authority.

On August 16, 1984, the Ingham Circuit Court issued its opinion, denying the commission's motions, but granting Union Carbide's motion for summary judgment. The court explained that the commission had shown no statutory basis for ordering Consumers to discontinue the noneconomic operation of its Karn units and to cease taking delivery of oil under Consumers' contract with Union Carbide. As a result, the court concluded that the commission's order was an unauthorized interference with Consumers' management.

> The Court will grant Union Carbide's motion for summary judgment because she finds merit in its argument that the MPSC's order was, to the extent it forbade Consumers to honor the Union Carbide-Consumers contract or to burn fuel purchased in accordance therewith in the Karn #3 and Karn #4 plants, in excess of the MPSC's authority and jurisdiction.

---

[4] In July of 1982, while its case against the commission was pending in Ingham Circuit Court, Union Carbide filed suit against Consumers in federal district court, seeking $162 million in damages from Consumers for breach of contract. In September of 1986, United States District Judge Charles Joiner provisionally ruled in Consumers' favor. The court concluded that if the commission's partial final order stood after the conclusion of the appeals process in the Michigan courts, the order would constitute force majeure and relieve Consumers of liability for failure to take delivery of any oil subsequent to the commission's May 13 order. On April 9, 1987, the federal district court case was dismissed by stipulation of the parties.

* * *

The MPSC has not shown a basis for its actions in any statute. In oral argument, the MPSC seemed to have shifted ground and explained that because of an existing rate system which passed on certain costs automatically, the challenged provisions of the order were legitimated. Again, no statutory basis for this argument is provided. What was done by the MPSC in this case, with clearly the highest intentions, was an unauthorized and therefore impermissible intrusion into the management of Consumers Power. As suggested by Judge Giddings at the hearing prior to issuance of the injunction pendente lite, assuring that ratepayers not pay for the fuel oil purchases is one thing, but intruding into the management decision to buy and burn the fuel oil is quite another.

Having lost at the trial court level, the commission then filed an appeal in the Court of Appeals. In July of 1986, the Court of Appeals reversed the judgment of the Ingham Circuit Court and reinstated the decision of the commission, 153 Mich App 217; 395 NW2d 292 (1986).[5] The Court

---

[5] As appellant Union Carbide notes, the Court of Appeals erred in reinstating, *in full,* the commission's order.

The Circuit Court's opinion acknowledged all the issues raised by Union Carbide and noted that the summary judgment motion was based on only two of them, lack of statutory authority and unconstitutional impairment of contract. App 138a.[6] Because the Circuit Court granted Union Carbide summary judgment on the statutory authority issue, it never addressed the remaining issues.

. . . The Court of Appeals failed to recognize that additional issues were presented by Union Carbide's complaint and that those issues never had been ruled upon by the Circuit Court. Instead, the Court of Appeals simply restored the commission's order to full effect without remanding the case to the Circuit Court for further proceedings.

---

[6] As described by the Circuit Court's opinion, App 137a, Union Carbide's claims are:

"Count I—The MPSC exceeded its statutory authority and jurisdiction.

of Appeals concluded, without much analysis, that the commission had acted properly and within its authority in ordering Consumers to cease the non-economic operation of the Karn units and to limit acceptance of oil deliveries from Union Carbide to those necessary for economic operation. The Court also found "no merit" to the argument that the commission's order impaired the obligation of the contract between Consumers and Union Carbide.

Both Consumers and Union Carbide applied for leave to appeal in this Court; the commission filed a cross-application for leave to appeal. In February of 1987, the Court granted leave to appeal, limited to the question

> whether the Public Service Commission exceeded its authority in ordering intervening plaintiff [Consumers] not to operate certain oil-fired plants in other than economic order and to cease taking deliveries of oil under a contract with plaintiff [Union Carbide] except to the extent required by such economic operation. [428 Mich 857 (1987).]

The Court denied the commission's application for leave to appeal as cross-appellant.[6]

"Count II—The MPSC order would impair the obligations of contracts in violation of US Const, art I, § 10 and Const 1963, art 1, § 10.

"Count III—The MPSC's action was arbitrary and capricious.

"Count IV—The MPSC's action violated procedural due process in violation of US Const, Am XIV and 1963 Const, art 1, § 17.

"Count V—The MPSC entered the order contrary to various legal requirements.

"Count VI—The MPSC's order was contrary to *Attorney General v Michigan Public Service Commission,* 412 Mich 385, 405, 416 [316 NW2d 187] (1982)."

[6] In its application for leave to cross-appeal, the commission took issue with the Court of Appeals conclusion that Union Carbide had standing to file suit to challenge the commission's order to Consumers

## II. DISCUSSION

The Public Service Commission possesses no "common law" powers. See *Huron Portland Cement Co v Public Service Comm,* 351 Mich 255, 262; 88 NW2d 492 (1958). As a creature of the Legislature, the commission possesses only that authority bestowed upon it by statute.

> The Michigan public utilities commission[7] is an administrative body created by statute and the warrant for the exercise of all its power and authority must be found in statutory enactments. [*Sparta Foundry Co v Public Utilities Comm,* 275 Mich 562, 564; 267 NW 736 (1936).]

See also *G & A Truck Line, Inc v Public Service Comm,* 337 Mich 300, 305; 60 NW2d 285 (1953); *Kirkby v Public Service Comm,* 320 Mich 608, 612; 32 NW2d 1 (1948). Thus, a determination of the commission's powers requires an examination of the various statutory enactments pertaining to its authority.

### 1. THE PUBLIC SERVICE COMMISSION ACT

Section 6 of the Public Service Commission act, MCL 460.1 *et seq.;* MSA 22.13(1) *et seq.,* which

and that Consumers could intervene as a party plaintiff in the lawsuit brought by Union Carbide against the commission. See *Union Carbide v Public Service Comm,* 153 Mich App 217, 223-228; 395 NW2d 292 (1986).

[7] The Public Service Commission was created by statutory enactment. Dissatisfied with the performance of the Public Utilities Commission, the Michigan Legislature enacted the Public Service Commission act, 1939 PA 3, MCL 460.1 *et seq.;* MSA 22.13(1) *et seq.,* abolishing the Public Utilities Commission and establishing the Public Service Commission. The Public Service Commission acquired all the rights, powers, and duties vested in its predecessor, the Public Utilities Commission. See *Detroit & T S L R Co v Public Service Comm,* 324 Mich 195, 199; 36 NW2d 896 (1949).

outlines the commission's power and jurisdiction, provides in pertinent part:

> The Public Service Commission is vested with complete power and jurisdiction to regulate all public utilities in the state except a municipally owned utility, the owner of a renewable resource power production facility as provided in section 6d, and except as otherwise restricted by law. *The Public Service Commission is vested with the power and jurisdiction to regulate all rates, fares, fees, charges, services, rules, conditions of service, and all other matters pertaining to the formation, operation, or direction of such public utilities.* The Public Service Commission is further granted the power and jurisdiction to hear and pass upon all matters pertaining to, necessary, or incident to the regulation of all public utilities, including electric light and power companies, whether private, corporate, or coöperative, gas companies, water, telephone, telegraph, oil, gas and pipeline companies, motor carriers, and all public transportation and communication agencies other than railroads and railroad companies. [MCL 460.6(1); MSA 22.13(6)(1). Emphasis added.]

Although its language is broad, § 6 merely serves as an outline of the commission's jurisdiction, not as a grant of specific authority or powers. As this Court concluded in *Huron Portland Cement, supra* at 263:

> The broad language [of § 6] furnishes no grant of specific powers. It is an outline of jurisdiction in the commission and does not purport to be more. If, indeed, the general language quoted had the effect of vesting particular, specific, powers in the commission, not only would a constitutional question be presented arising from an asserted lack of standards . . . , but there would have been no need whatever for the many statutes enacted (both before and after the effective date of PA 1939, No

3) vesting specific powers in the commission. [Citations omitted.]

See also *Detroit Edison Co v Richmond Twp,* 150 Mich App 40, 49; 388 NW2d 296 (1986). Since the commission's powers are limited by statute and § 6 furnishes no grant of specific powers, § 6 by itself offers little support for the commission's order in this case.

The commission's argument, however, does not rely solely on the broad statutory language of § 6. Instead, the commission contends that § 6 provides an outline of its permissible powers upon which various other statutory sections elaborate. Thus, the commission concludes that § 6, in conjunction with other statutory provisions, provides the authority for its order in this case.

For example, the commission argues that its authority to fix and regulate reasonable utility rates, of necessity, encompasses the power to prevent noneconomic management practices which threaten the integrity of the ratemaking process. As this Court asserted in *Detroit v Public Service Comm,* 308 Mich 706, 716; 14 NW2d 784 (1944), "[i]t is the duty of the commission, under its statutory power, to fix a just and reasonable rate." See also MCL 460.6a(1), (2); MSA 22.13(6a)(1), (2).

The commission's argument, though it may be economically supportable, is legally unsound. The commission is a creature of the Legislature and, as such, possesses only those powers conferred upon it by statute. See *G & A Truck Line, supra* at 305; *Kirkby, supra* at 612; *Sparta Foundry, supra* at 564. The power to fix and regulate rates, however, does not carry with it, either explicitly or by necessary implication, the power to make management decisions.

It must never be forgotten that while the State

> may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies and is not clothed with the general power of management incident to ownership. [*Missouri ex rel Southwestern Bell Telephone Co v Public Service Comm,* 262 US 276, 289; 43 S Ct 544; 67 L Ed 981 (1923).]

The commission acted properly in preventing Consumers from passing on to ratepayers any additional fuel expenses incurred while operating the Karn units out of economic order.[8] This portion of the commission's order related directly to its power to regulate rates and charges; Consumers was passing through to the consuming public increased charges due to its noneconomic operation.

By comparison, the connection between the commission's explicit statutory authority to set rates and its alleged authority to order the cessation of certain noneconomic management practices is much more attenuated. Furthermore, by its own admission, the commission excluded from Consumers' base rates the increased fuel costs stemming from noneconomic operation of the Karn units. Thus, the commission prevented Consumers' noneconomic operation of the Karn units from adversely affecting both the utility's base rates as well as the charges passed through to ratepayers in the fuel adjustment clauses.

Although Consumers' actions might make the ratemaking process lengthier and more difficult, this increased complexity alone does not justify the commission's action in this case. The commission possesses the authority to regulate a utility's rates and charges. It exercised that authority by precluding Consumers' recovery of those increased charges incurred as a result of the company's

---

[8] This portion of the commission's order is not at issue in this appeal.

noneconomic operation of the Karn units. However, by ordering Consumers to cease certain noneconomic management practices, the commission exceeded its ratemaking authority.[9]

### 2. THE PUBLIC UTILITIES COMMISSION ACT

Section 4 of the Public Service Commission act explicitly carried forward the rights, powers, and duties accorded the Public Utilities Commission.

> All the rights, powers, and duties vested by law in the Michigan public utilities commission shall be transferred to and vested in the Michigan public service commission created in section 1, and shall be exercised and performed by it. The Michigan public service commission shall have and exercise all rights, privileges and the jurisdiction in all respects as has been conferred by law and exercised by the Michigan public utilities commission. [MCL 460.4; MSA 22.13(4).]

Thus, a determination of the limits of the commission's power requires an examination of the provisions of the Public Utilities Commission act, 1919 PA 419, MCL 460.54; MSA 22.4.

Section 4 of the Public Utilities Commission act set forth, in general terms, the powers and duties

_____

[9] Although 1982 PA 304, an amendment of the Public Service Commission act, was enacted subsequent to the commission's order in this case, § 6j of 1982 PA 304 provides an indication of the Legislature's intent with regard to the authority of the Public Service Commission. Section 6j(7) empowers the commission to indicate in its review of a utility's five-year plan, see MCL 460.6j(3), (4); MSA 22.13(6j)(3), (4), any cost items for which the utility likely would not recover. Thus, the Legislature specifically provided a review procedure by which the commission could indicate to utilities those costs the commission considered nonrecoverable. Had the Legislature wanted to give the commission the authority to order the cessation of noneconomic management practices, which resulted in nonrecoverable costs, the Legislature could have done so explicitly in the Public Service Commission act.

of the Public Utilities Commission. Section 4 provided, in pertinent part:

> [The Commission's] *jurisdiction* shall be deemed to extend to and include the control and regulation, including the fixing of rates and charges, of all public utilities within this state producing, transmitting, delivering or furnishing steam for heating or power, or gas for heating or lighting purposes for the public use. [MCL 460.54; MSA 22.4. Emphasis added.]

By itself, this language does little to resolve the question at issue in this case. As this Court noted in *Mason Co Civil Research Council v Mason Co,* 343 Mich 313, 326-327; 72 NW2d 292 (1955):

> "The power and authority to be exercised by boards or commissions must be conferred by clear and unmistakable language, since a doubtful power does not exist." [Citing 67 CJS, Officers, § 107, p 378.]

Yet, the only power granted with any specificity in § 4 is the power to fix utility rates and charges. The language of § 4 is no more specific than is the language of § 6 of the Public Service Commission act, which this Court, in *Huron Portland Cement, supra,* construed as merely an outline of the commission's jurisdiction, not a grant of specific powers.

Moreover, the mere recital of the power to control and regulate public utilities does not, of necessity, entail the power to order a utility to follow particular principles of economic management. In fact, the power to regulate does not convey with it the power to exercise general management powers. See *Southwestern Bell Telephone Co, supra* at 289; 73B CJS, Public Utilities, § 12b, p 153. Since § 4 of

the Public Utilities Commission act does not specifically confer upon the commission the power to make management decisions concerning the economic operations of a public utility, § 4 adds little to an appreciation of the limits of the commission's powers.

The commission also cites § 5 of the Public Utilities Commission act as support for its order in this case. Section 5 provides as follows:

> The commission shall also have authority to make and prescribe regulations for the conducting of the business of public utilities, subject to the jurisdiction thereof, and it shall be the duty of every corporation, joint stock company, association or individual owning, managing or operating any such utility to obey such rules and regulations. [MCL 460.55; MSA 22.5.]

But § 5 is not applicable to the facts of this case. The commission's order was not pursuant to a regulation empowering it to order a utility, under certain circumstances, to cease particular management practices. As appellant Consumers notes, this case "does not involve the promulgation of rules or regulations . . . ."

Finally, one of the more persuasive arguments advanced by the commission is that § 8 of the Public Utilities Commission act vested it with broad powers to investigate, coupled with extensive powers to act pursuant to its investigation. Section 8 provides:

> *Upon complaint in writing* that any rate, classification, regulation or practice charged, made or observed by any public utility is unjust, inaccurate, or improper, to the prejudice of the complainant, the commission shall proceed to investigate the matter. The procedure to be followed in all

such cases shall be prescribed by rule of the commission: Provided, however, That in all cases reasonable notice shall be given to the parties concerned as to the time and place of hearing. . . . Upon the completion of any such hearing, the *commission shall have authority to make an order or decree dismissing the complaint or directing that the rate, charge, practice or other matter complained of, shall be removed, modified or altered,* as the commission deems just, equitable and in accordance with the rights of the parties concerned. [MCL 460.58; MSA 22.8. Emphasis added.]

However, MCL 460.58; MSA 22.8 also does not apply to the facts of this case because the commission did not satisfy the statutory prerequisite of a complaint in writing. While the commission may make a complaint on its own motion, see 1979 AC, R 460.31(1), it did not do so in this case. Consumers originally applied to the commission for an increase in its electric rates. In its notice of hearing on the application for rate relief, the commission noted that it had commenced, on its own motion, an investigation into Consumers' "existing rates, charges, revenue deficiencies or excesses, services, practices, procedures and operations . . . ." The commission's notice of hearing, however, was not a complaint. See, e.g., 1979 AC, R 460.31, 460.32. Moreover, even though the language of investigation in the commission's notice was broad, the language describing the commission's purpose in investigating was limited to corrective action taken only as to proposed rates and charges.

[T]he investigation will not necessarily be confined to matters contained in the application but will include all matters pertaining to the reasonableness and justness of Applicant's electric rates,

charges, operations and practices as *may be necessary to enable the commission to determine whether the existing or proposed rates and charges are unreasonable and excessive or inadequate and should therefore be increased, reduced or altered.* [Emphasis added.]

Moreover, despite the commission's argument to the contrary, dicta from this Court's decision in *Attorney General v Public Service Comm,* 412 Mich 385; 316 NW2d 187 (1982), does not support the commission's conclusion that MCL 460.58; MSA 22.8 gives it the authority to order Consumers to cease noneconomic management practices. In *Attorney General,* the Court held that the scope of the commission's inquiry in a securities issue proceeding "[did] not extend to the wisdom of the project which a utility [sought] to fund through the issuance of long-term securities." *Id.* at 391-392.[10] The commission had approved the issuance of securities to finance the construction of three different generating facilities. The Attorney General and the Michigan Citizens Lobby challenged the commission's decisions, arguing that the commission should have considered the need for the plants' construction in determining whether to approve an issuance of securities for continued construction. Although the Court rejected this argument, it did explain, in dicta, that the commission was not without the authority to conduct preconstruction review of potential generating facilities in order to determine whether to issue securities to finance construction. On the basis of this dicta, the commission argues that if it may "determine the *need* for plant construction, logic dictates that the Commission has the power under

[10] See the public securities act, MCL 460.301 *et seq.;* MSA 22.101 *et seq.*

the same grant of authority to require the halt to uneconomic dispatch . . . ."

The commission's analogy, however, is flawed. In *Attorney General,* the Court did not assert that the commission had the power to order a utility to cease construction of a generating plant. Rather, the Court stated that the commission could determine that construction of a generating plant was unreasonable or unnecessary and could refuse to allow an issuance of securities for its construction. By analogy to *Attorney General,* the commission could disallow the pass-through to consumers of increased fuel expenses incurred by Consumers because of its noneconomic operation of its Karn units. But the commission could not order Consumers to cease operating its Karn units out of economic order. This order was equivalent to ordering a utility to cease construction of a generating plant whose construction the commission found unreasonable. *Attorney General* did not go this far; thus, it does not stand for the proposition advanced by the commission.

### 3. THE RAILROAD ACT

One of the more interesting arguments advanced by the commission is that the authority vested in the Michigan Railroad Commission, which was transferred to the Michigan Public Utilities Commission and then to the Michigan Public Service Commission, empowers the commission to order a utility to cease certain noneconomic practices. The Public Utilities Commission act, 1919 PA 419, MCL 460.54; MSA 22.4, explicitly transferred to the Public Utilities Commission the same measure of authority over utilities that the Michigan Railroad Commission exercised over railroads. In turn, § 4 of the Public Service Commission act trans-

ferred to the Public Service Commission "[a]ll the rights, powers, and duties vested by law in the Michigan public utilities commission . . . ." MCL 460.4; MSA 22.13(4). Since the commission now possesses the same measure of authority over utilities as the Railroad Commission once did over railroads, an examination of the provisions of the railroad act, 1909 PA 300, MCL 462.2 *et seq.;* MSA 22.21 *et seq.,* is in order.

The Railroad Commission did not enjoy sweeping powers, rather, its authority was narrow and limited by statute.

> The Michigan Railroad Commission is a body possessing limited powers, to be ascertained by reference to the statute creating it. [*Grand Rapids & I R Co v Railroad Comm,* 183 Mich 383, 392; 150 NW 154 (1914).]

Nonetheless, the commission argues that several provisions of the railroad act, when read together, empower the commission to inquire into and rectify unreasonable or noneconomic management practices.

First, § 28 of the railroad act provided the Railroad Commission with the authority to inquire into the management of a railroad's business.

> The commission shall have authority to inquire into the management of the business of any common carrier and shall keep itself informed as to the manner and shall have the right to obtain from any common carrier all necessary information to enable the commission to perform the duties and carry out the objects for which it is created. [MCL 462.28(a); MSA 22.47(a).]

Second, § 22 of the act empowered the Railroad Commission to investigate unreasonable rates or inadequate service.

Upon complaint in writing of any person, firm or corporation or association, or of any mercantile, agricultural or manufacturing society, or of any body politic or municipal organization, that any of the rates, fares, charges or classifications, or any joint rate or rates are in any respect unreasonable or unjustly discriminatory, or that any regulation or practice whatsoever affecting the transportation of persons or property or any service in connection therewith, is in any respect unreasonable or unjustly discriminatory, or that any service is inadequate, the commission shall notify the common carrier complained of that complaint has been made and shall furnish a copy of the said complaint with said notice, and twenty [20] days after such notice has been given the commission may proceed to investigate the same as hereinafter provided . . . . If, upon such investigation, the rate or rates, joint rate or rates, fares, charges or classifications, regulation, practice or service complained of shall be found to be unreasonable, inadequate or unjustly discriminatory, the commission shall have power to and it shall determine and by order fix and order substituted therefor, such rate or rates, joint rate or rates, fares and charges, as is or are just and reasonable, and which shall be the maximum to be charged in the future, and such classifications, regulation, practice or service as is or are just, reasonable and adequate, and which shall be imposed and followed or service rendered in future in lieu of that found to be unreasonable, inadequate or unjustly discriminatory, and in either case the commission shall make an order that the common carrier cease and desist from such violation, and shall conform to the regulation and practice so prescribed . . . . [MCL 462.22(a); MSA 22.41(a).]

Finally, § 32 of the railroad act empowered the commission, after hearing and investigation of any unreasonable charge, regulation, or practice to regulate such charge, regulation, or practice as provided by § 22 of the act.

> Whenever, after hearing and investigation as provided in this act, the commission shall find that any charge, regulation or practice affecting the transportation of passengers or property, or any service in connection therewith not herein specifically designated, is unreasonable or unjustly discriminatory, it shall have the power to regulate the same as provided in section 22 of this act. [MCL 462.32; MSA 22.51.]

The commission argues that these provisions of the railroad act, coupled with the transfer of power provisions in the Public Utilities Commission and Public Service Commission acts, support the commission's authority to inquire into a utility's management and order the cessation of non-economic management practices.

This argument, however, overlooks the fact that the commission initiated the investigation in this case without "[a] complaint in writing of any person [etc.] . . . ." Section 22(c) provides the authority for the commission to investigate on its own motion.

> Whenever the commission shall believe that any rate or rates or charge or charges may be unreasonable or unjustly discriminatory, or that any service is inadequate, and that any investigation relating thereto should be made, it may, upon its own motion, investigate the same. Before making such investigation, it shall present to the common carrier a statement in writing, *setting forth the rate or charge to be investigated.* Thereafter, on ten [10] days' notice to the common carrier of the time and place of such investigation, the *commission may proceed to investigate such rate or charge* in the same manner and *make like orders in respect thereto* as if such investigation had been made upon complaint. [MCL 462.22(c); MSA 22.41(c). Emphasis added.]

The language of § 22(c), unlike that of § 22(a), is

much more circumscribed. Although sentence one of § 22(c) refers to investigation of rates, charges, or inadequate service, sentence two indicates that the investigation of inadequate service relates to its effect upon rates or charges. After all, sentence two states that the commission must present in writing the rate or charge—not the service—to be investigated. Moreover, the final sentence of § 22(c) states that the commission may investigate the rate or charge complained of and make orders in respect to such rate or charge. Therefore we do not find that the railroad act supports the commission's authority to order Consumers to stop operating its Karn units out of economic order and to discontinue accepting oil under its contract with Union Carbide except as required for economic operation under the circumstances of this case.

The commission also argues that § 4 of the railroad act imposes on utilities a statutory duty to maintain just and reasonable rates.[11] While the commission has such a statutory duty, this duty does not necessarily imply the power to require utilities to undertake prudent management practices. The commission may disallow increased expenses incurred as a result of mismanagement, but it may not require a utility not to incur particular expenses. See discussion *ante,* pp 150-152.

Finally, the commission notes that § 44 of the railroad act vests the commission with police pow-

---

[11] Every common carrier is hereby required to furnish reasonably adequate service and facilities and shall provide and furnish transportation of passengers and property upon reasonable requests therefor, and all charges made for any service in connection therewith, or for the receiving, switching, delivering, storing, transporting or handling of such persons or property shall be reasonable and just, and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful. [MCL 462.4(a); MSA 22.23(a).]

ers.[12] Standing alone, however, this statutory provision offers little support for the commission's actions in this case. To begin with, § 44 does not delineate the commission's powers; thus, the specific powers of the commission are to be ascertained by reference to statute. See *Grand Rapids & I R Co, supra* at 392. In addition, a strict, as opposed to a liberal, construction of statutory provisions granting away the state's police power is preferable.

> The legislature is regarded as the guardian of society, and therefore is not presumed to disable itself or abandon the discharge of its duty. It follows that the courts are inclined towards a strict interpretation of statutes that tend to grant away the police power of the state. . . .
>
> The presumption in favor of the state's retention of its police power, as a factor in the interpretation of public grants, is influenced by constitutional considerations. Constitutions are widely understood to withhold from legislatures any authority to bargain away their police power and so the rule of statutory interpretation that every presumption will be indulged in to sustain the constitutionality of a statute is germane to the rule of strict construction for statutes purporting to grant such power. [3 Sands, Sutherland Statutory Construction (4th ed), § 63.07, p 151.]

Since no other provision of the railroad act em-

---

[12] The police powers of the state over railroads, street railways, interurban railways and suburban street railways, whether operated by steam, electricity or other motive power, organized or doing business in this state, shall be and the same are hereby vested in the railroad commission, and it is hereby made the duty of said railroad commission to exercise the same in accordance with the requirements of the law. [MCL 462.44; MSA 22.62.]

powered the commission in this case to order Consumers to cease certain noneconomic practices, it cannot be the authority for the commission's order.

### 4. THE ELECTRIC TRANSMISSION ACT

The commission argues that § 7 of the electric transmission act, 1909 PA 106, MCL 460.557; MSA 22.157, reinforces its position that it possesses the authority to order an electric utility, such as Consumers, to cease noneconomic operation.[13] Section 7 provided, in pertinent part:[14]

*Upon complaint in writing by any consumer or city, village, or township, by its duly constituted common or village council or township board, or other duly constituted authority of such city, village or township,* relative to the price of the electricity sold and delivered in such municipality, or with reference to the service rendered or any other matter of complaint, the commission shall investigate such complaint and may by its agents, examiners, inspectors, engineers and accountants inspect the system and method used in transmitting and supplying electricity and examine or cause to be examined the books and papers of such person, firm or corporation pertaining thereto. The commission shall cause notices of such complaint with a copy thereof to be served on the person, firm or corporation complained of or affected thereby which shall have a right to be heard in respect to the matter complained of at a convenient time and place to be fixed in such notice. After such investigation and hearing, the commission within lawful limits may by order fix the price of electricity to be charged by such person,

---

[13] The power to regulate electric utilities was transferred to the Railroad Commission by the electric transmission act, 1909 PA 106, MCL 460.551 *et seq.;* MSA 22.151 *et seq.*

[14] MCL 460.557; MSA 22.157 was amended by 1987 PA 8.

firm or corporation, and the price so fixed, of which such person, firm or corporation shall have notice, shall be the price to be charged until the commission shall again fix the price to be charged therefor. Said commission may also by order establish such rules and conditions of service as shall be just and reasonable. [MCL 460.557; MSA 22.157. Emphasis added.]

The commission's argument, however, is again flawed. The investigatory and remedial powers conferred upon the commission in § 7 are initiated by a written complaint. The statutory language limits the complainants to consumers and to cities, villages, townships, or their duly constituted authorities. Section 7 does not give the commission the authority to make, on its own motion, a complaint regarding a utility's prices or services. Moreover, since no written complaint with respect to Consumers, relative to its prices, services, or other matters was made, § 7 does not apply to the facts of this case.

### III. CONCLUSION

None of the statutory provisions offered by the commission supports its argument that it possessed the authority, in this case, to order Consumers Power Company to stop operating its Karn units out of economic order and to limit acceptance of oil deliveries from Union Carbide to those necessary for economic operation. The provisions offered by the commission either do not apply to the facts of this case or do not confer the power to make management decisions with the same degree of specificity that the Legislature used in conferring upon the commission the authority to set utility rates.[15] Since we resolve this case on the

_____

[15] We emphasize that this holding is the product of thirty years of

basis of statutory authority, we need not reach appellants' second issue—the constitutional question of impairment of contractual obligation. We reverse the judgment of the Court of Appeals and reinstate the judgment of the Ingham Circuit Court.

RILEY, C.J., and LEVIN, CAVANAGH, BOYLE, ARCHER, and GRIFFIN, JJ., concurred with BRICKLEY, J.

---

legislative acquiescence following *Huron Portland Cement Co v Public Service Comm,* 351 Mich 255; 88 NW2d 492 (1958). The historical process of legislative overlay, in which the Public Service Commission act, 1939 PA 3, was superimposed upon the Public Utilities Commission act, 1919 PA 419, which was itself superimposed upon the Railroad Commission act, 1909 PA 300 (with reference to 1909 PA 106 governing the transmission of electricity), has created a statutory jungle. Each decision issued by the courts in the area of utilities regulation entails a journey into the heart of darkness in which the only reliable guideposts are this Court's own prior decisions. The time has long passed for a comprehensive review of this legislation.

The relevant acts do contain specific grants of "managerial" authority to the Public Service Commission, although the very specificity of these grants indicates that general managerial authority has never been conferred upon the PSC. See, e.g., MCL 460.551, 460.552, 460.555; MSA 22.151, 22.152, 22.155.