# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Application of DETROIT EDISON
COMPANY re Licensing Rules.

---

ASSOCIATION OF BUSINESSES
ADVOCATING TARIFF EQUITY,

      Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION,
TILDEN MINING COMPANY, LC, and EMPIRE
IRON MINING PARTNERSHIP,

      Appellees,

and

DETROIT EDISON COMPANY, INDIANA
MICHIGAN POWER COMPANY, MICHIGAN
ELECTRIC & GAS ASSOCIATION, and
CONSUMERS ENERGY COMPANY,

      Petitioners-Appellees.

UNPUBLISHED
February 8, 2018

No. 332605
PSC
LC No. 00-016020

---

Before: RONAYNE KRAUSE, P.J., and FORT HOOD and O'BRIEN, JJ.

PER CURIAM.

Appellant, Association of Businesses Advocating Tariff Equity (ABATE), appeals as of right an order of the Michigan Public Service Commission (PSC) maintaining the prohibition on Michigan retail electric customers of regulated utilities from bidding demand responses into regional wholesale electric power markets. We affirm.

## I. BACKGROUND AND THE UNDERLYING PROCEEDINGS

This case concerns the complicated relationship between the wholesale and retail electric markets and what rules and regulations should govern the participation of retail electric

-1-

customers in the wholesale market. The Federal Power Act (FPA), 16 USC 791a *et seq.*, grants to the Federal Energy Regulatory Commission (FERC) the authority to regulate wholesale electric energy transactions in interstate commerce. 16 USC 824(b). The power to regulate retail sales of electric energy rests with state utility commissions. *Id.*

The production, transmission, and sale of electric energy have, over the years, become a competitive interstate industry. Electricity now flows through an interconnected grid that covers most of the country. *FERC v Electric Power Supply Ass'n*, ___ US ___; 136 S Ct 760, 768; 193 L Ed 2d 661 (2016). FERC has sought to ensure that wholesale electric rates remain reasonable by encouraging competition. To further that effort, FERC encouraged the development of entities known as wholesale market operators to manage regional wholesale markets. Seven wholesale market operators now manage the electric grid that provides much of the electric load, i.e., the amount of electricity used, for the country. This cooperation ensures reliable transmission of electricity throughout the country. Each market operator conducts an auction to set the wholesale price of electricity. *Id.*

In *FERC v Electric Power Supply Ass'n*, the United States Supreme Court explained the purpose and procedures of these auctions as follows:

These wholesale auctions serve to balance supply and demand on a continuous basis, producing prices for electricity that reflect its value at given locations and times throughout each day. Such a real-time mechanism is needed because, unlike most products, electricity cannot be stored effectively. Suppliers must generate—every day, hour, and minute—the exact amount of power necessary to meet demand from the utilities and other "load-serving entities" (LSEs) that buy power at wholesale for resale to users. To ensure that happens, wholesale market operators obtain (1) orders from LSEs indicating how much electricity they need at various times and (2) bids from generators specifying how much electricity they can produce at those times and how much they will charge for it. Operators accept the generators' bids in order of cost (least expensive first) until they satisfy the LSEs' total demand. The price of the last unit of electricity purchased is then paid to every supplier whose bid was accepted, regardless of its actual offer, and the total cost is split among the LSEs in proportion to how much energy they have ordered. So, for example, suppose that at 9 a.m. on August 15 four plants serving Washington, D.C. can each produce some amount of electricity for, respectively, $10/unit, $20/unit, $30/unit, and $40/unit. And suppose that LSEs' demand at that time is met after the operator accepts the three cheapest bids. The first three generators would then all receive $30/unit. That amount is (think back to Econ 101) the marginal cost—*i.e.*, the added cost of meeting another unit of demand—which is the price an efficient market would produce. See 1 A. Kahn, The Economics of Regulation: Principles and Institutions 65-67 (1988). FERC calls that cost (in jargon that will soon become oddly familiar), the locational marginal price, or LMP.

As in any market, when wholesale buyers' demand for electricity increases, the price they must pay rises correspondingly; and in those times of peak load, the grid's reliability may also falter. Suppose that by 2 p.m. on August

15, it is 98 degrees in D.C. In every home, store, or office, people are turning the air conditioning up. To keep providing power to their customers, utilities and other LSEs must ask their market operators for more electricity. To meet that spike in demand, the operator will have to accept more expensive bids from suppliers. The operator, that is, will have to agree to the $40 bid it spurned before—and maybe, beyond that, to bids of $50 or $60 or $70. In such periods, operators often must call on extremely inefficient generators whose high costs of production cause them to sit idle most of the time. See Energy Primer 41-42. As that happens, LMP—the price paid by all LSEs to *all* suppliers—climbs ever higher. And meanwhile, the increased flow of electricity through the grid threatens to overload transmission lines. See *id.*, at 44. As every consumer knows, it is just when the weather is hottest and the need for air conditioning most acute that blackouts, brownouts, and other service problems tend to occur.

Making matters worse, the wholesale electricity market lacks the self-correcting mechanism of other markets. Usually, when the price of a product rises, buyers naturally adjust by reducing how much they purchase. But consumers of electricity—and therefore the utilities and other LSEs buying power for them at wholesale—do not respond to price signals in that way. To use the economic term, demand for electricity is inelastic. That is in part because electricity is a necessity with few ready substitutes: When the temperature reaches 98 degrees, many people see no option but to switch on the AC. And still more: Many State regulators insulate consumers from short-term fluctuations in wholesale prices by insisting that LSEs set stable retail rates. See *id.*, at 41, 43-44. That, one might say, short-circuits the normal rules of economic behavior. Even in peak periods, as costs surge in the wholesale market, consumers feel no pinch, and so keep running the AC as before. That means, in turn, that LSEs must keep buying power to send to those users—no matter that wholesale prices spiral out of control and increased usage risks overtaxing the grid.

But what if there were an alternative to that scenario? Consider what would happen if wholesale market operators could induce consumers to refrain from using (and so LSEs from buying) electricity during peak periods. Whenever doing that costs less than adding more power, an operator could bring electricity supply and demand into balance at a lower price. And simultaneously, the operator could ease pressure on the grid, thus protecting against system failures. That is the idea behind the practice at issue here: Wholesale demand response, as it is called, pays consumers for commitments to curtail their use of power, so as to curb wholesale rates and prevent grid breakdowns. See *id.*, at 44-46.

These demand response programs work through the operators' regular auctions. Aggregators of multiple users of electricity, as well as large-scale users like factories or big-box stores, submit bids to decrease electricity consumption by a set amount at a set time for a set price. The wholesale market operators treat those offers just like bids from operators to increase supply. The operators, that is, rank order all the bids—both to produce and to refrain from consuming electricity—from least to most expensive, and then accept the lowest bids until

supply and demand come into equipoise. And, once again, the LSEs pick up the cost of all those payments. So, to return to our prior example, if a store submitted an offer *not* to use a unit of electricity at 2 p.m. on August 15 for $35, the operator would accept that bid before calling on the generator that offered to produce a unit of power for $40. That would result in a lower LMP—again, wholesale market price—than if the market operator could not avail itself of demand response pledges. See ISO/RTO Council, Harnessing the Power of Demand: How ISOs and RTOs Are Integrating Demand Response Into Wholesale Electricity Markets 40-43 (2007) (estimating that, in one market, a demand response program reducing electricity usage by 3% in peak hours would lead to price declines of 6% to 12%). And it would decrease the risk of blackouts and other service problems.

Wholesale market operators began using demand response some 15 years ago, soon after they assumed the role of overseeing wholesale electricity sales. Recognizing the value of demand response for both system reliability and efficient pricing, they urged FERC to allow them to implement such programs. See, *e.g.*, *PJM Interconnection, L.L.C.*, Order Accepting Tariff Sheets as Modified, 95 FERC ¶ 61,306 (2001), *California Independent System Operator Corp.*, Order Conditionally Accepting for Filing Tariff Revisions, 91 FERC ¶ 61,256 (2000). And as demand response went into effect, market participants of many kinds came to view it—in the words of respondent Electric Power Supply Association (EPSA)—as an "important element[] of robust, competitive wholesale electricity markets." App 94, EPSA, Comments on Proposed Rule on Demand Response Compensation in Organized Wholesale Energy Markets (May 12, 2010).

Congress added to the chorus of voices praising wholesale demand response. In the Energy Policy Act of 2005, 119 Stat. 594 (EPAct), it declared as "the policy of the United States" that such demand response "shall be encouraged." §1252(f), 119 Stat. 966, 16 U.S.C. §2642 note. In particular, Congress directed, the deployment of "technology and devices that enable electricity customers to participate in . . . demand response systems shall be facilitated, and unnecessary barriers to demand response participation in energy . . . markets shall be eliminated." *Ibid*. [*FERC*, 136 S Ct at 768-770 (footnotes omitted).]

On October 17, 2008, FERC issued a rule entitled "Wholesale Competition in Regions with Organized Electric Markets," 125 FERC ¶ 61,071 (2008) (Docket Nos. RM07-19-000 and AD07-7-000) (commonly known as "Order 719"), to promote demand response programs. Order 719 required the operator of a regional transmission grid, known as a regional transmission organization (RTO), to amend its rules to allow aggregators of retail electric

customers to bid demand response resources from those customers directly into the RTO's wholesale market in accordance with specified criteria.[1]

On August 13, 2009, Detroit Edison, Indiana Michigan Power Company, and Michigan Electric & Gas Association filed a joint application requesting that the PSC conduct an investigation to construct appropriate procedures to allow retail customers to participate in demand response. The applicants also requested that the PSC preclude the participation of retail customers in wholesale markets until it issued a ruling. In response, the PSC issued an order inviting comments from interested parties, and also restricted Michigan retail electric customers from participating in any RTO wholesale market during the pendency of the proceeding.

In an order entered on December 2, 2010, the PSC rejected the assertion from various parties, including ABATE, that it lacked the jurisdiction to prohibit retail customers from participating in organized wholesale power markets, noting that in Order 719 and Order 719-A, FERC recognized the authority of a state regulating body to determine if and how retail customers, either directly or through ARCs, could participate in wholesale power markets.[2]

On March 15, 2011, FERC issued a rule entitled "Demand Response Compensation in Organized Wholesale Markets," 134 FERC ¶ 61,187 (2011) (Docket No. RM10-17), commonly known as "Order 745." In this order, the FERC directed that RTOs must pay demand response participants the full locational marginal price (LMP) during the periods when a net benefits test was satisfied.

Energy industry associations challenged Order 745 and, in *FERC v Electric Power Supply Ass'n*, 410 US App DC 103; 753 F3d 216 (2014), rev'd 136 S Ct 760 (2016), the United States Court of Appeals for the District of Columbia vacated Order 745. The court held that Order 745 violated the FPA because it invaded the right of states to regulate retail sales of electricity. *Id*. at 224. However, in *FERC v Electric Power Supply Ass'n*, the United States Supreme Court reversed that decision and remanded the matter for further proceedings. The Supreme Court held that Order 745 did not violate the FPA because demand response practices directly affected wholesale rates for electricity. *FERC*, 136 S Ct at 766-767. The Supreme Court also concluded that FERC's order that demand response providers be compensated at the LMP was not arbitrary and capricious. *Id*. at 767.

---

[1] In Order 719-A, 128 FERC ¶ 61,059 (2009), FERC prohibited market operators from accepting bids including aggregated demand response from customers of utilities that distributed up to 4 million megawatt-hours (MWh) of electricity during the previous year, unless the utility's regulating body authorized such aggregation.

[2] The PSC directed that within 120 days of the issuance of final FERC orders, utilities with electric distribution exceeding four million MWhs were to file contested cases and proposed tariffs related to the participation of retail customers in wholesale markets. Subsequently, the PSC withdrew its directive that utilities should file contested case hearings within a specified period, agreeing with the PSC Staff that such proceedings should not begin until all matters before the FERC were completed.

Subsequently, on March 29, 2016, the PSC issued an order maintaining the prohibition on Michigan retail electric customers, either individually or through aggregators, from bidding demand response resources into regional wholesale markets. The PSC's order states:

> In light of the U.S. Supreme Court's decision and the filings in this docket, the Commission remains unpersuaded that it should now lift the ban that was placed into effect by the prior orders in this docket. The following concerns were raised regarding aggregation of demand response resources for sale in the wholesale market: (1) operational issues for Michigan jurisdictional utilities, on both the real-time and long-term bases, especially with respect to capacity planning and procurement as well as emergency operations; (2) lack of Commission oversight of third-party aggregators; (3) the possibility that customers may enroll a demand response resource in more than one demand response program; and (4) cross-subsidization. The comments did not adequately address these concerns, and therefore the Commission believes the prohibition should remain in place. The Commission does not intend by this order to foreclose the possibility of third party aggregation forever, but finds that, for the present, the prohibition should remain in place. The Commission agrees with EnerNOC [a company that contracts with utilities to provide demand response resources] that closing this docket will provide an opportunity for meaningful conversations on demand response outside of a contested case. The Commission is also focused on addressing demand response opportunities and barriers, and time-of-use rates, through other proceedings, such as today's order in Case No. U-17936 *et al*.

> THEREFORE, IT IS ORDERED that Michigan retail electric customers (either individually or through aggregators) of Commission jurisdictional electric utilities are prohibited from bidding demand response resources into regional transmission operator wholesale markets, and this docket is closed.

> The Commission reserves jurisdiction and may issue further orders as necessary.

ABATE has claimed an appeal from the PSC's March 29, 2016, order.

## II. STANDARD OF REVIEW

The standard of review for PSC orders is narrow and well defined. A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *Attorney General v Pub Serv Comm*, 165 Mich App 230, 235; 418 NW2d 660 (1987). Pursuant to MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. *Mich Consol Gas Co v Pub Serv Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of proving by clear and convincing evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a mandatory statute or abused its discretion in the exercise of

its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999). An order is unreasonable if it is not supported by the evidence. *Associated Truck Lines, Inc v Pub Serv Comm*, 377 Mich 259, 279; 140 NW2d 515 (1966).

A reviewing court gives due deference to the PSC's administrative expertise, and is not to substitute its judgment for that of the PSC. *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999). We give respectful consideration to the PSC's construction of a statute that the PSC is empowered to execute, and we will not overrule that construction absent cogent reasons. If the language of a statute is vague or obscure, the PSC's construction serves as an aid to determining the legislative intent, and will be given weight if it does not conflict with the language of the statute or the purpose of the Legislature. However, the construction given to a statute by the PSC is not binding on the courts. *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 103-109; 754 NW2d 259 (2008). Whether the PSC exceeded the scope of its authority is a question of law that we review de novo. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003).

III. ANALYSIS

On appeal, ABATE argues that the PSC lacked the authority to prohibit retail electric customers from bidding demand response resources into RTO wholesale markets. It asserts that in the absence of specific authority, FERC's Orders 719 and 745 control and allow retail customers or aggregators to participate in RTO wholesale markets. We disagree.

The PSC has only the authority granted to it by statute. The grant of power must be specific; a doubtful power does not exist. *Union Carbide Corp v Pub Serv Comm*, 431 Mich 135, 148-150; 428 NW2d 322 (1988).

The FPA reserves to the states the authority to regulate retail electric services. Section 824(b) of the FPA, 16 USC 824(b)(1), provides:

> The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

The PSC is the relevant electric retail regulatory authority in Michigan, MCL 460.1 (establishing the PSC), and it is "vested with complete power and jurisdiction to regulate all public utilities," and has "the power and jurisdiction to regulate all rates, fares, fees, charges, services, rules, conditions of service, and all other matters pertaining to the formation, operation, or direction of

public utilities." MCL 460.6(1). The PSC's jurisdiction "shall be deemed to extend to and include the control and regulation, including the fixing of rates and charges, of all public utilities within this state . . . ." MCL 460.54.

ABATE's essential argument is that FERC allows retail customers or aggregators to participate in RTO wholesale markets, and that the PSC lacks the authority to prohibit such participation. ABATE's argument is without merit. In *FERC v Electric Power Supply Ass'n*, 136 S Ct at 780, the United States Supreme Court specifically recognized that Order 745 "allows any State regulator to prohibit its customers from making demand response bids in the wholesale market." ABATE's argument rests on the fact that no specific statute authorizes the PSC to prohibit retail customers or aggregators from participating in RTO wholesale markets. However, the lack of a statute authorizing the PSC to take a specific action does not mandate a conclusion that the PSC cannot take that action. The PSC's general ratemaking and regulatory authority has been recognized as encompassing the power to take specific actions. For example, in *In re Application of Mich Consol Gas Co*, 281 Mich App 545; 761 NW2d 482 (2008), this Court held that the PSC's general ratemaking power authorized it to approve a certain surcharge, notwithstanding the absence of a specific statute addressing the topic. This Court held that the authorization of the surcharge was within the PSC's general ratemaking power. *Id*. at 547-550. In this case, the PSC's power to regulate service and conditions of service as set out in MCL 460.6(1) is sufficient authority for the PSC to determine that retail electric customers or aggregators should be prohibited from participating in wholesale markets. The PSC did not exceed its statutory authority by prohibiting retail electric customers or aggregators from participating in demand response wholesale markets.

ABATE also argues that the PSC denied retail customers and aggregators due process by precluding their participation in the wholesale market without first conducting a contested case hearing. We disagree.

An administrative decision, such as a case decided by the PSC, is conducted as either a contested or a non-contested case. A "contested case" is defined as "a proceeding, including rate-making, price-fixing, and licensing, in which a determination of the legal rights, duties, or privileges of a named party is required by law to be made by an agency after an opportunity for an evidentiary hearing." MCL 24.203(3). A non-contested case is any determination that does not fall within this definition. *Mich Ass'n of Home Builders v Dep't of Labor & Economic Growth Dir*, 481 Mich 496, 498; 750 NW2d 593 (2008).

This proceeding began in August 2009 when Detroit Edison, Indiana Michigan Power Company, and Michigan Electric & Gas Association filed an application requesting that the PSC investigate rules and regulations regarding the participation of retail electric customers in the wholesale market, as recently authorized by Order 719, and make appropriate determinations regarding that participation. The application specifically requested that during the pendency of the proceeding the PSC preclude retail customers from participating in the wholesale market. Significantly, the application did not seek a contested case hearing in this matter.

This matter was not a contested case as that term is defined in MCL 24.203(3) from the outset, but rather was a vehicle to explore the issue of retail electric customer participation in the

wholesale markets. The matter was not designed to determine rates or any legal duties of any party, and due process did not require the holding of a contested case.

Finally, ABATE argues that the PSC's decision to continue the prohibition on retail electric customer participation in the wholesale market was arbitrary and capricious because it lacked reasoned analysis. We disagree.[3]

This Court has observed that the terms "arbitrary" and "capricious" are defined as follows:

> Arbitrary means fixed or arrived at through an exercise of will or by caprice, without consideration or adjustment with reference to principles, circumstances or significance, and capricious means apt to change suddenly, freakish or whimsical. [*Mich Farm Bureau v Dep't of Environmental Quality*, 292 Mich App 106, 141; 807 NW2d 866 (2011) (quotation marks and citation omitted).]

ABATE's argument that the PSC's order precluding retail customers from participating in wholesale markets is arbitrary and capricious because it was not based on evidence or reasoning is not supported by the record. The PSC opened this case in response to an application. The PSC solicited and received voluminous comments from many parties, including ABATE. The PSC considered those comments, along with the FERC's Orders 719 and 745, and the United States Supreme Court's decision in *FERC v Electric Power Supply Ass'n* before making a final determination. The PSC listed four concerns, which it concluded were not adequately addressed, and so left the ban on retail participation in the wholesale market in place for the present time. The PSC specifically stated that it did not intend by this order to foreclose forever the possibility of retail participation in the wholesale market, but concluded that for the present its original prohibition should remain effective. The PSC provided a reasoned explanation for its decision. The fact that ABATE disagrees with the PSC's decision does not make the decision arbitrary or capricious. *Mich Farm Bureau*, 292 Mich App at 141.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Karen M. Fort Hood
/s/ Colleen A. O'Brien

---

[3] The parties dispute whether the arbitrary and capricious standard applies in this case. Because this does not affect the outcome of our decision, we assume for purposes of this appeal that it applies.